No. 22196.

James Wilson Bishop *v.* The People of the
State of Colorado.
(439 P.2d 342)

Decided April 15, 1968.

Niel L. Good, for plaintiff in error.

Duke W. Dunbar, Attorney General, Frank E. Hickey, Deputy, James W. Creamer, Jr., Assistant, Robert Hoecker, Assistant, for defendant in error.

*En Banc.*

Mr. Justice Day delivered the opinion of the Court.

JAMES WILSON BISHOP, whom we will designate as defendant, was convicted by a jury verdict of second degree murder. This writ of error is directed to a judgment and sentence of from 16 to 30 years in the state penitentiary.

The victim of the murder was Mark A. Yourtz, the three-year-old son of defendant's wife, Barbara June Bishop, by a former marriage. The defendant married Mark's mother on December 2, 1964. The death of the boy took place on January 18, 1965.

At the outset, a brief summary of the evidence is necessary as a background for putting defendant's points of error in proper focus. A more detailed recital will be given later on to answer the specific points raised.

The People's case was entirely circumstantial. It established that Mark was picked up by the defendant at the home of Mrs. Bishop's mother and that from that time until a fire rescue unit arrived in response to a call by defendant, Mark was in the exclusive custody of the defendant. When the boy left his grandmother's home he was in good health, without any marks or injuries. When the fire rescue unit arrived he was suffering from severe trauma; he was unconscious; and he failed to respond to resuscitative measures taken by the Fire Department. The autopsy report, testified to in greater detail by the pathologist, revealed that Mark died of a lacerated liver and transected pancreas; he had a fractured skull with swelling of the brain; and he also had severe bruises in various places on his body.

The defendant testified in his own defense. He stated that after leaving the grandmother's home at 7:30 a.m. he drove directly back to his apartment where he and the boy had breakfast and they played together for a while. Defendant then took a short nap, and upon awakening sometime around 11 a.m. he found that Mark had vomited and had had a bowel movement in his pants. He further stated that on two previous occasions that morning the boy had vomited and that he had repri-

manded Mark lightly by slapping him twice on the buttocks. He insisted that he had not administered any further punishment to the boy. The defendant explained that he had placed Mark on the toilet seat in the bathroom in order to undress him and clean him. He stated that while he went to get a pair of clean shorts and a towel he left Mark standing on the toilet seat; but upon returning to the bathroom he found Mark on the floor with his head resting against the back of the tub. His further testimony was that the boy was unconscious; that he was having difficulty breathing; and that he tried various means of artificial respiration, including pressing on the abdomen of the child while he was lying face up, but that he was unable to revive the child. He then called the Fire Department, the members of whom used artificial respiration and a resuscitator, to no avail.

I.

The first of defendant's assignments of error is that the trial court improperly allowed the prosecution to attempt to impeach the testimony of the defendant's wife by the use of hearsay evidence. The allegedly prejudicial hearsay evidence came into the record under the following circumstances:

Mrs. Bishop was called as a witness for the defense. On direct examination she testified that the defendant loved Mark and that their life together had been a happy one. On cross-examination Mrs. Bishop was asked concerning specific prior inconsistent statements made to specific individuals, which she denied. To impeach Mrs. Bishop, the specific persons to whom the alleged inconsistent statements were claimed to have been made, were called to testify in rebuttal. They related statements made to them by Mrs. Bishop which contradicted her in-court testimony of the loving relationship that existed between Mark and the defendant. The defendant objected on the ground that these statements were made outside of the presence of the defendant, without his knowledge, and were, therefore, in the hearsay category.

■ It is true that the conversations between the defendant's wife and the impeaching witnesses were hearsay. However, prior inconsistent statements, if relevant, material and not collateral (*i.e.*, where the cross-examining party would be entitled to prove the matters inquired into as part of his case), are admissible not to prove the facts asserted, but to discredit the witness and to show that because of the contradictory statements the witness is not worthy of belief. *Mitsunaga v. People,* 54 Colo. 102, 129 P. 241; *Askew v. People,* 23 Colo. 446, 48 P. 524; 3 J. Wigmore, Evidence §1018 (3d ed.); C. McCormick, Evidence §39.

■ The impeaching testimony introduced was material, relevant and not collateral. Malice required for second degree murder in the instant case is implied malice such as can be determined by the jury from the circumstantial evidence. Defendant's attitude and conduct toward Mark was both material and relevant to such jury determination. It was proper, therefore, for the prosecution to introduce impeaching testimony relevant to Mrs. Bishop's declaration on direct examination that the defendant was affectionate toward and solicitious of Mark's welfare. It is clear from the record that the prosecutor established — both in laying the foundation in his cross-examination of Mrs. Bishop and in calling the witnesses to whom he had directed Mrs. Bishop's attention — that statements of the witnesses were introduced solely for the purposes of impeachment. If the defendant desired a cautionary instruction as to the purpose of the admission of such testimony, he should have requested it. See *Lanford v. People,* 159 Colo. 36, 409 P.2d 829: *Stull v. People,* 140 Colo. 278, 344 P.2d 455.

## II.

Defendant's second argument is directed to Instruction No. 5, claimed to be erroneous. The instruction given is as follows:

"Intent is manifested by the circumstances connected

with the perpetration of an offense and the sound mind and discretion of the person accused. A person shall be considered of sound mind who has arrived at the age of fourteen years, or before that age if such person knows the distinction between good and evil.

"You are further instructed that a man is presumed to intend the natural and probable consequences of his voluntary acts."

Specific objection is made that the final paragraph should have been modified by a clear statement from the court that it was the function of the jury to determine defendant's intent, and further, that the court should have made it clear that by the giving of such instruction the court itself was not presuming the intent of the defendant.

 A presumption of intent will not support the conviction of a crime where specific intent to commit the crime is required, such as first degree murder or assault with intent to commit murder. However, where the crime charged involves general intent such as second degree murder, and such an Instruction as No. 5 is deemed proper, we have, in such cases, approved its use. See *Tucker v. People,* 136 Colo. 581, 319 P.2d 983. As we have repeatedly stated, all of the instructions are to be read together as a whole, and the jury was properly directed by other instructions that the People have the burden to prove beyond a reasonable doubt every material element of the crime. One of the material and necessary ingredients to be proved in this case was the general intent. It was, therefore, not necessary in Instruction No. 5 to again repeat what was already contained in other instructions. It is clear that the jury was correctly informed by all of the instructions that it was within their province to determine whether the requisite intent was established from the circumstances connected with the perpetration of the offense.

### III.

The next point of error is the assertion that the trial

court erred in submitting to the jury Instruction No. 11 A. The particular portion to which objection was made reads as follows:

"If you should find beyond a reasonable doubt that death ensued from an attack made with the hands or feet, or otherwise, upon an infant of tender years, you are then instructed that under such circumstances malice may be implied."

██ ██ It is probably true, as a general rule, that where death ensues from an attack made with the hands or feet on a person of mature years, who is in good health, malice cannot be implied. Ordinarily, death would not be caused by such means. However, this general rule does not apply where such an assault with the hands or feet is committed on an infant of tender years or a person enfeebled by old age or disease. In such cases malice may be implied. *Balltrip v. People,* 157 Colo. 108, 401 P.2d 259; *Milosevich v. People,* 119 Colo. 56, 199 P.2d 895; *McAndrews v. People,* 71 Colo. 542, 208 P. 486.

The defendant does not argue that the instruction is not a correct statement of the law but rather contends that the instruction is erroneous in this case because there was "no evidence whatsoever" of any attack upon Mark by the defendant with hands or feet, or otherwise. We do not agree. While there is no direct evidence as to how Mark received his injuries, the medical testimony established severe trauma, with a tearing of the liver and complete bisecting of the pancreas, caused by a heavy blunt blow to the abdomen consistent with the force of a fist or foot. It was the theory of the defendant in his testimony that the damage must have been caused at the time he administered artificial respiration and heart massage, and that the heavy pressure exerted by him on the abdomen of the child caused the injuries. The pathologist who performed the autopsy testified, however, that although some damage to the liver or to

the pancreas from such artificial respiration was a remote possibility, such severe damage as seen here could not be the result of such applied pressure; rather it was inconsistent with it.

Dr. Barlock, another pathologist, testifying in behalf of the defendant, offered some contradictory testimony. He stated he formed his opinion solely on the basis of the autopsy report and that, although he had never seen a transected pancreas caused by artificial respiration, it was his opinion that such could be the cause of Mark's fatal injuries. He qualified his statement by saying that Mark's injuries would be far more commonly caused from a blunt trauma of a fist or foot to the abdomen than from the pressure of artificial respiration.

The evidence of the autopsy report and the opinion that the injuries were consistent with the use of a fist or foot were not speculative and were, therefore, sufficient to support the instruction. The evidence does not have to be conclusive or uncontradicted if there is enough evidence in the record on which the instruction is based.

## IV.

Defendant objected to Instruction No. 17 and argues that it shifted the burden of proof on the cause of Mark's death to the defendant. The instruction was as follows:

"You are instructed that if you find from the evidence that the death of Mark A. Yourtz resulted from any one or more of the following causes:

"a. His inability to receive air because of a closing of the air passage in his throat resulting from a fall from the toilet seat, or from prior existing physical defect;

"b. From a fall from the toilet seat which produced injuries which alone caused his death;

"c. That the defendant in attempting to administer artificial respiration to the said Mark A. Yourtz, accidentally caused injuries which alone resulted in his death;

"d. That death resulted from a combination of injuries received from any two or more of the above stated causes, any one of which alone would not have caused death;

"Then you should find the defendant not gui.ty, or if you have a reasonable doubt as to the guilt of the defendant then your verdict should be not guilty."

We can find no language in or any inference to be drawn from the instruction that the defendant was required to prove anything. Keeping in mind that the jury was adequately instructed on the presumption of defendant's innocence; that the presumption continued until overthrown by evidence sufficient to exclude al! reasonable doubt of his guilt; and that the burden of proof was on the People, under such circumstances Instruction No. 17 merely reiterated that if there existed reasonable doubt in the minds of the jurors as to the guilt of the defendant, they must find him not guilty. The instruction merely sets forth the various theories advanced by the defendant through his own testimony, the testimony of an expert, and through cross-examination of other witnesses. The instruction makes no mention of any burden being on the defendant to prove one or more of the incidents mentioned. Defendant additionally argues that the instruction should have contained a statement that the People must "negate beyond a reasonable doubt" the defendant's theory of the case. No case is cited, and we know of none which places such a burden on the people.

V.

From what has been said previously concerning the circumstantial evidence and the inference which the minds of reasonable men would draw therefrom, there was sufficient evidence to submit the case to the jury. We, therefore, hold that the defendant's final argument that the court should have directed a verdict of acquittal for the defendant and that the verdict was based solely

on speculation, on possibility, or on mere suspicion of guilt, is without merit.

The judgment is affirmed.

MR. JUSTICE MCWILLIAMS not participating.