STATE OF NORTH CAROLINA v. DANNY L. SALLIE

No. 7112SC694

(Filed 23 February 1972)

**1. Criminal Law § 105— nonsuit motion at end of State's evidence — waiver — introduction of evidence**

By introducing evidence, defendant waived his motion for nonsuit made at the close of the State's evidence. G.S. 15-173.

**2. Criminal Law § 104— motion for nonsuit — consideration of defendant's evidence**

On motion for nonsuit in a criminal case, defendant's evidence, unless favorable to the State, is not to be considered; however, when not in conflict with the State's evidence, it may be used to explain or clarify that offered by the State.

**3. Homicide § 21— death of three-year-old child — blow to abdomen — sufficiency of evidence of defendant's guilt**

The evidence was sufficient to be submitted to the jury on the issue of defendant's guilt of second degree murder of a three-year-old child where it tends to show that the child died as a result of receiving a severe blow on her abdomen, that the blow was received at a time when defendant and the child were alone together in a house trailer which had been jointly rented by defendant and the child's mother, that the blow causing death left a bruise mark on the child's abdomen which closely approximated the size and shape of the heel of a man's boot, that defendant was in military service and was wearing boots, that there were other bruises and cuts on the head and body which occurred close to or at the time of death, that the child had been horribly abused over a period of time prior to her death and that such abuse did not commence until defendant started living in the trailer with the child's mother.

**4. Criminal Law § 172; Homicide § 25— submission of first degree murder — harmless error**

Conviction of second degree murder rendered harmless error, if any, in submitting to the jury the question of defendant's guilt of first degree murder, absent some showing that the verdict of guilty of second degree murder was affected by the submission of the greater offense.

**5. Homicide § 20— photographs of victim's body**

The trial court did not err in the admission of thirteen color photographs of the body of a three-year-old child for the purpose of illustrating a pathologist's testimony as to cuts and bruises found on the child's body.

**6. Criminal Law § 162— instructions to disregard testimony — sufficiency**

In this prosecution for murder of a three-year-old child wherein defendant objected to and moved to strike a pathologist's testimony that a bruise on the child's abdomen "is reminiscent of a heel mark,"

the trial court's instruction to the jury that "you may disregard what caused the bruise" was sufficient to apprise the jury that they were not to regard the witness' testimony as an expression of an expert opinion that the bruise had in fact been produced by a blow from a heel, although it may have been preferable for the court to have given the jury a more positive instruction.

**7. Homicide § 26— instructions on second degree murder — assault with hands or fists on three-year-old child**

The trial court did not err in instructing the jury that they might find defendant guilty of second degree murder if they found from the evidence and beyond a reasonable doubt that defendant intentionally assaulted the three-year-old decedent "with his hands, fist, or feet, which were then used as deadly weapons," and that her death was a proximate result of his acts.

**8. Homicide § 14— assault with hands or feet — presumption of malice**

If death ensues from an attack made with the hands or feet on a person of mature years and full health and strength, the law does not imply malice required to make the homicide second degree murder, but malice is implied where such an assault is committed upon an infant of tender years or upon a person enfeebled by age, sickness or other apparent physical disability.

APPEAL by defendant from *Bailey, Judge,* 31 May 1971 Session of Superior Court held in CUMBERLAND County.

Defendant was indicted for the first-degree murder of Pamela LeGros. He pleaded not guilty. The State's evidence showed:

Pamela LeGros, a little three-year-old girl who weighed 35 to 40 pounds, died on 17 July 1970. The pathologist who performed the autopsy testified that the immediate cause of death was a rupture of the liver and an extensive rupture of the heart, that these occurred almost simultaneously, and that his opinion was that "a rather strong blow" in the region of the abdomen over the liver could have ruptured the liver and forced such pressure back up in the area of the heart as to cause the rupture of the heart. It was the pathologist's opinion that the blow "could have resulted from the child falling, but it would have required excessive distance" and that it also would have required that she land on "a blunt object of some sort." The only wounds he had seen of this type had been the result of falls from a very high distance. There was a semicircular bruise on the child's abdomen just above the navel and approximately over the liver. In the pathologist's opinion the blow which caused this semicircular bruise was the same blow which ruptured the internal organs and caused death.

State v. Sallie

The pathologist testified there was a rupture of the spleen, which was probably of one or two weeks' duration, and that he found 85 to 100 bruises on the child's body. Some of these were on her head and the remainder were on her trunk and extremities. The bruises ranged in size from those just barely visible to some which were approximately the size of a silver dollar, and some merged together, making them difficult to count. The bruises ranged from those of very recent age to those of a few days' age. In addition, there were three cuts on her head, each approximately a half inch in length. The cuts on the top and on the side of her head had scabs on them, which indicated they were of several hours to a few days' age. The cut on the back of the head showed some bleeding, and in the opinion of the pathologist occurred very close to or at the time of death. The distribution of the bruises showed "a kick mark on the head and the majority of it." On the left arm there were two circular pinch-type bruises which the pathologist described as "a human bite mark."

A doctor who had examined Pamela on 25 June 1970, approximately three weeks prior to her death, testified that "at that time she was covered with multiple bruises and traumas, including a very large one on her arm, one on her trunk of various sizes, some the size of a nickel and then some the size of a half dollar." These bruises were of various ages, from one day to three to four weeks. This doctor did not perform a complete physical examination, but examined the child from the waist up and prescribed an iron and worm medicine.

The State's evidence also showed: On 17 July 1970 Pamela lived with her mother and her eleven-year-old sister, Lynda, in a trailer on Lot 117 in Dreamland Trailer Park in the City of Fayetteville. Pamela's mother and father, James LeGros, were separated. In April 1970 the manager of the trailer park had rented Lot 117 to the defendant, Danny L. Sallie, and to Pamela's mother, who represented themselves to be Mr. and Mrs. Danny L. LeGros. Pamela's mother worked as office manager at Albert Love Enterprises at Fort Bragg, and defendant was a Specialist Fourth Class in military service. Defendant had a room at Fort Bragg, but most of the time lived in the trailer with Mrs. LeGros, Pamela, and Lynda.

About 7:30 a.m. on 17 July 1970 defendant and two individuals from his military unit came to the trailer and took

Pamela's mother to Womack Army Hospital, where she had an appointment with a doctor. At that time Lynda and Pamela were left alone in the trailer. Later, about 10:00 o'clock, defendant picked up Pamela's mother at the hospital and took her to Love Enterprises, saying that he was going back to his company and, when he could, would go back to the trailer and pick up Pamela, take her to the baby-sitter's house, and take Lynda swimming. About 10:00 o'clock a lady who lived on Lot 216 in the trailer park saw Lynda and Pamela. Pamela was pale at that time and had on a white sweater which was too big for her. About 11:30, another neighbor, who lived at Lot 118 in the trailer park, observed Pamela standing alone in the yard, dressed in a long, white sweater.

Lynda LeGros, who was twelve years old at the time of the trial, testified that she got up about 6:30 in the morning on 17 July 1970, and remembered defendant coming in and leaving with her mother. The record on this appeal contains the following narration of Lynda's testimony:

"That after Danny and her mother left she and Pamela were left in the trailer. That Danny came back some time after 11:30, between 11:30 and twelve and she and Pamela were still in the trailer. That she and Pamela had been outside of the trailer earlier in the morning, playing in the yard. That they had not been playing with any other boys or girls that morning. That when Danny came back Pamela and she were on the floor and that Pamela was alright at that time. That she was planning to go to the store and then to Howard Beach but Pamela was not going. That she did leave and go to the store and was gone about ten minutes at the longest, or about four or five minutes. That when she left there was no one else in the trailer other than Danny and Pamela. When she came back Danny and Pamela were in the trailer. That she did not see anyone else in or about the trailer at that time."

The manager of the trailer park testified that between 12:00 and 1:00 o'clock on 17 July 1970 she went to the trailer on Lot 117 in response to a phone call. About fifteen or twenty minutes before receiving the phone call, she had seen Lynda LeGros going across the street in the direction of the 7-11 Store, which was located about two blocks from Lot 117. When the manager reached the trailer, she found the door standing wide

State v. Sallie

open, water running all over the floor, and the television going full blast. She went inside the trailer, down the hallway into the bathroom, and turned off the water faucet in the tub. She was unable to turn off the television and walked out without touching anything else in the trailer. The manager did not see anyone go in or out of the trailer from the time she left it until she returned to the trailer with a police officer.

Two police officers, who examined the trailer about 2:30 p.m., testified that they found "a complete shambles as far as arrangement of furniture and clothing." In the living room there was a sofa, a coffee table in front of the sofa, on which there was a basket and a white knit sweater, an ironing board with an iron on top of it, a small table, and a trash can. (The neighbor who had seen Pamela standing alone in the yard at about 11:30 a.m., identified the sweater found on the coffee table from a picture taken by the officers as the sweater which she had seen Pamela wearing that morning.) There were stains on the sofa. Shoes and articles of clothing were strewn about the floor in the hallway, the bedroom, and the bathroom of the trailer, and water was standing on the bathroom floor.

The operator of a service station adjoining the trailer park testified that a little after 2:00 p.m. defendant pulled up in front of the service station and had a little girl in his arms. The defendant came into the station. The little girl appeared to be unconscious. Defendant wanted to know what to do with the child, and the operator told him the best thing to do was to take the child to the hospital. The operator saw another girl, who was across from the service station at the 7-11 Store. Defendant called her and she came and got in the car with him. Defendant drove off in the direction of Fort Bragg. Defendant was upset.

The operator of a second service station located about a quarter of a mile farther down the road toward Fort Bragg, testified that he saw defendant on 17 July 1970 "somewhere in the vicinity of twelve or one-thirty p.m." At that time defendant drove up in a car and jumped out with a little girl in his arms. The girl had turned blue and "appeared like a drowned person." Defendant asked the witness if he knew anything about children. The witness put his ear to the chest of the little girl and couldn't hear anything, and told defendant the best thing he could do was to get her to a hospital. "Defendant grabbed

State v. Sallie

her and shook her as if trying to revive her" and got in the car and left. Another little girl was with him.

A lady who had baby-sat for Pamela for five or six months ending in January 1970, testified that during that time and ever since she had known Pamela "she was a tiny child with little bones and a pale complexion but had no marks or injuries on her." A lady who knew defendant and Pamela's mother testified that on 29 May 1970 they had brought Pamela to her home to give a birthday gift to the witness' daughter. This witness testified that "at that time, on the 29th May, Pamela LeGros was terribly bruised and had a bad bite mark on her forearm and indentations of old bite marks on her upper arm." The witness inquired how the child had received these, and "the defendant stated Pamela had done something wrong and he was going to correct her and that she was running from him and had run into a wall at the end of the trailer." Dorothy LeGros had asked to be told again how the child was injured at that time and "Danny told her that he had related the story over and over again and wasn't going to say anything further; . . . a conversation was held further concerning the bite marks and Dorothy said Danny had bit her playing with her and Danny said he was not playing with her, that she had bitten him and he bit her back to teach her not to bite."

Defendant testified on direct examination in substance as follows: During July 1970 he stayed some nights at the trailer and contributed financially to the support of Dorothy LeGros and her two daughters. About 6:30 or 7:00 in the morning of 17 July 1970 he went to the trailer, accompanied by two individuals from his military unit. He found Dorothy, Lynda and Pamela in the back bedroom asleep. About 8:00 o'clock he left the trailer with Dorothy LeGros, leaving Pamela and Lynda behind. He returned to the trailer some time after 11:00 o'clock and found Lynda and Pamela there. Pamela was sitting beside the door extremely dirty. She had on a large white sweater, and he told her to get on the couch. He gave Lynda some change from his pocket and told her to go get something for lunch. Lynda went out but came back in because she decided she did not have enough money to buy food at the store. Defendant had taken one of his boots off and had taken his shirt off. He went into the bathroom, leaving Lynda standing with her sister, and started running water in the tub to get Pamela cleaned up. He

then took his other boot off in the bathroom. "That he was in the bathroom perhaps a minute to a minute and a half, the time of which he is not sure. That Lynda then hollered and he went back in the front room and found Pamela lying between the coffee table and the couch. That he picked Pamela up and layed her down and she was foaming at the mouth. That he then picked Pamela up and went to the car because he was scared." Defendant testified that Lynda had been at the trailer when he left and accompanied him to the two filling stations; that he left the second filling station and went straight to Womack Army Hospital, where he pulled up in front of the building and a medic came out and took the little girl into the emergency room. Defendant testified that he had never beat, kicked or stomped Pamela, and considered himself, during that period of time, to be responsible as a father to both children.

On cross-examination defendant testified that prior to 17 July 1970 Pamela did have bruises. She played with kids in and about the trailer, and some of them were much older than Pamela. Around the end of May he had had occasion to caution two boys in particular about being rough with her. He had bitten Pamela once on the arm and he was playing with her. Pamela had received an injury on the back of her head during a trip with him and several other children in a car. He did not know how she received the bruise which she had on the side of her face at the time of her death, or the bruise on her arm. Defendant testified that he had spoken to two detectives about the events of 17 July, and the best he could recall he told them that he was in the back running the tub when he heard a sound coming from the living room area and rushed out and found Pamela lying face up with an iron lying beside her. He testified that he did not pick the iron up and put it back on the ironing board.

In rebuttal, the State called as a witness one of the detectives with whom defendant had talked. This witness testified that on 26 September 1970 he had shown defendant some pictures of Pamela, and that the only bruises defendant could identify were the ones on the right side of her face. Defendant stated these came from a car accident, when he stopped the car very fast and Pamela hit her face on the dash; that defendant had told the witness this accident had occurred prior to 25 June.

State v. Sallie

The jury found defendant guilty of murder in the second degree. From judgment imposing a prison sentence for a term of thirty years, defendant appealed.

*Attorney General Robert Morgan by Assistant Attorney General Millard R. Rich, Jr., for the State.*

*Gary E. Conn and Assistant Public Defender William S. Geimer for defendant appellant.*

PARKER, Judge.

**[1, 2]** Appellant assigns error to the denial of his motions for nonsuit. By introducing evidence, defendant waived his first motion, which was made at the close of the State's evidence. G.S. 15-173; *State v. McWilliams,* 277 N.C. 680, 178 S.E. 2d 476. On this appeal, therefore, we consider only defendant's second motion, made at the close of all the evidence. This brings in question the sufficiency of all the evidence to take the case to the jury. In determining this question, we apply the well-established rules that on motion for nonsuit in a criminal case the evidence must be considered in the light most favorable to the State, the State is entitled to every reasonable inference which may legitimately be drawn from the evidence, and defendant's evidence, unless favorable to the State, is not to be considered. However, when not in conflict with the State's evidence, defendant's evidence may be used to explain or clarify the evidence offered by the State. *State v. Jones,* 280 N.C. 60, 184 S.E. 2d 862. "Contradictions and discrepancies, even in the State's evidence, are for the jury to resolve, and do not warrant nonsuit." 2 Strong, N.C. Index 2d, Criminal Law, § 104, p. 649.

When viewed in the light most favorable to the State, the evidence in this case would establish the following: Pamela LeGros, a frail little three-year-old girl, died on 17 July 1970 as result of receiving a severe blow on her abdomen. The blow was of such force as to cause an immediate and simultaneous rupture of her heart and liver. The blow was received at a time when Pamela and defendant, a grown man in military service, were alone together in a house trailer which had been jointly rented by defendant and Pamela's mother. The only real question for the jury was whether defendant struck the blow, as the State contends, or the blow resulted from an accidental fall, as defendant contends. In our opinion the evidence, when

State v. Sallie

viewed in accordance with the rules above set forth, was suffi-
cient to support a jury finding that defendant struck the blow.

There was evidence that the blow which caused death was
the same blow which left a semicircular bruise mark on the
child's abdomen; the pathologist testified that in his opinion
this was so. The size and shape of this semicircular bruise mark
closely approximated the size and shape of the heel of a man's
boot. There were numerous other bruise marks distributed over
the child's entire body, some of which were of very recent ori-
gin. The pathologist testified that the distribution of these
bruises showed "a kick mark on the head and the majority of it."
There was a fresh cut on the back of the head, which occurred
very close to or at the time of death. There were pinch-type
bruises, described by the pathologist as "a human bite mark,"
on the child's arm. There was evidence from which the jury
could find that the child had been horribly abused over a period
of time prior to death. There was evidence that this abuse did
not commence until about the time defendant started living in
the trailer with Pamela's mother.

[3] While it is difficult to comprehend how any man, however
brutal, could commit acts of such unrestrained savagery upon a
frail and helpless child as the evidence in this case indicates,
the nature and extent of the multiple injuries inflicted on little
Pamela's body at or about the time she received the blow which
caused her death were not such as would normally have resulted
from a single accidental fall occurring while she played in the
living room of her mother's house trailer. Rather, her wounds
furnish mute but eloquent testimony that they may have been
caused by a sustained, savage, and intentional attack, during the
course of which the death blow was delivered. When all circum-
stances warranted by the evidence are considered together and
when the State is given the benefit of all legitimate inferences
which may reasonably be drawn therefrom, we find in this case
substantial evidence of every essential element of the crime of
second-degree murder of which defendant was found guilty.
This was all that was required to justify submitting the case
to the jury. *State v. Stephens,* 244 N.C. 380, 93 S.E. 2d 431. It
was for the jury to determine whether guilt was established
beyond a reasonable doubt.

[4] Defendant contends that in any event there was no evi-
dence of premeditation and deliberation and therefore it was

State v. Sallie

error to submit an issue as to his guilt of first-degree murder. While the elements of premeditation and deliberation necessary for first-degree murder may be inferred in some cases from evidence of the vicious and brutal nature of a homicide, *State v. Duboise,* 279 N.C. 73, 181 S.E. 2d 393, it is not necessary for us to decide whether the circumstances disclosed by the evidence in the present case were sufficient for that purpose. Here, the jury acquitted defendant of the capital felony. Conviction of murder in the second degree rendered harmless any error, if any was committed, in submitting to the jury the question of defendant's guilt of the more serious offense, at least absent some showing that the verdict of guilty of the lesser offense was affected thereby. *State v. Casper,* 256 N.C. 99, 122 S.E. 2d 805; *State v. DeMai,* 227 N.C. 657, 44 S.E. 2d 218; *State v. Keyes,* 8 N.C. App. 677, 175 S.E. 2d 357. Defendant has not shown that his conviction was affected in any way by the jury's consideration of his possible guilt of the more serious charge.

[5]   During the testimony of the pathologist, the witness identified fourteen color photographs as correctly and accurately representing the body of Pamela LeGros as it appeared on 18 July 1970 when he performed the autopsy. The court excluded one of these, but over defendant's objection permitted the jury to see the remaining thirteen. In this there was no error. Defendant does not contend the photographs are inaccurate or were not properly taken and authenticated, and he admits that some of them were relevant. His contention is that others were irrelevant because "completely unrelated" to the cause of death and that the trial judge abused his discretion by permitting the the jury to see so many inflammatory and gruesome pictures. We do not agree. While the immediate cause of death may have been the result of a single severe blow to the child's abdomen, as the pathologist testified was his opinion, the condition of the child's entire body was relevant to the only real question before the jury, namely, under what circumstances and by what means did the child receive the fatal blow. "Ordinarily, a witness may use photographs to explain or illustrate anything which it is competent for him to describe in words, *State v. Atkinson, supra* (275 N.C. 288, 167 S.E. 2d 241); *State v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824, and if a photograph is relevant and material, the fact that it is gory or gruesome will not alone render it inadmissible." *State v. Chance,* 279 N.C. 643, 654, 185 S.E.

State v. Sallie

2d 227, 234. In the present case the photographs were used by the pathologist to illustrate his testimony. They served to make that testimony more intelligible to the jury. The trial judge instructed the jury that they were for purposes of illustration and were not substantive evidence. Each picture which the jury viewed was relevant and served a useful and proper purpose. There was no error in permitting the jury to see them.

[6] The record discloses that during the direct examination of the pathologist and immediately after the witness had described the semicircular bruise on the child's abdomen, the following occurred:

"Q. Can you determine the cause of the bruise that you described there, Doctor?

A. I can't specifically, but it is reminiscent of a heel mark.

Objection by Attorney Geimer, with motion to strike.

Court: Well, are you testifying out of your own personal experience or are you just sort of making a surmise?

A. Well, it looks like a heel mark but that is purely a surmise.

Court: All right, Ladies and Gentlemen, you may disregard what caused the bruise."

Defendant noted an exception to the foregoing and on this appeal contends that the trial judge committed prejudicial error entitling him to a new trial in failing to order the doctor's answer stricken and in failing to instruct the jury unequivocally that they must disregard it. We do not agree. It was clearly competent for the doctor to describe to the jury the shape and appearance of the bruise marks which he found on the child's body and to illustrate his testimony by use of the properly authenticated pictures. The jury had already heard this testimony and had seen the pictures showing the bruise in question. While it may have been preferable for the trial judge to have couched his instruction to the jury in more positive terms, it seems clear to us from the instruction as given that the jury understood that they were not to regard the doctor's answer as any expression of an expert opinion on his part that the bruise had in fact actually been produced by a blow from

State v. Sallie

a heel. On the contrary, it is clear that the jury understood that they were free to make their own determination from all of the evidence as to the manner in which the child's injuries had been received. Moreover, in other portions of his testimony the doctor, without objection as far as the record before us discloses, was permitted to describe other marks on the child's body as "a kick mark on the head and the majority of it" and as "a human bite mark." In view of this testimony, as to which defendant apparently interposed no objections, it hardly seems possible that the jury's verdict could have been affected by the trial judge's failure to express in a more positive manner his ruling on defendant's motion to strike. Harmless error not affecting the outcome of the trial does not warrant a new trial.

[7]   Appellant assigns error to portions of the court's charge to the jury. In particular, by assignment of error based on Exception No. 19, appellant contends error was committed when the court instructed the jury that they might find defendant guilty of second-degree murder if they found from the evidence and beyond a reasonable doubt that defendant "intentionally assaulted Pamela LeGros with his hands, fist, or feet, which were then used as deadly weapons," and that her death was a proximate result of his acts. Under the circumstances of this case the instruction was proper. The instruction does not assume facts not in evidence. There was competent evidence from which the jury might find that defendant had assaulted the deceased "with his hands, fist, or feet," and the instruction properly leaves it to the jury to determine whether he in fact did so and, if so, whether his hands, fist, or feet "were then used as deadly weapons."

[8]   It is true that ordinarily if death ensues from an attack made with hands and feet only, on a person of mature years and full health and strength, the law would not imply malice required to make the homicide second-degree murder. This is so because, ordinarily, death would not be caused by use of such means. The inference would be quite different, however, if the same assault were committed upon an infant of tender years or upon a person enfeebled by old age, sickness, or other apparent physical disability.

As long ago as 1859, Ruffin, J., speaking for our Supreme Court in *State v. West*, 51 N.C. 505, at 509, said:

"An instrument, too, may be deadly or not, according to the mode of using it or the subject on which it is used. For example, in a fight between men the fist or foot would not generally be regarded as endangering life or limb. *But it is manifest that a wilful blow with the fist of a strong man on the head of an infant, or the stamping on its chest, producing death, would import malice, from the nature of the injury likely to ensue.*" (Emphasis added.)

Decisions of other courts are in accord. In *Bishop v. People,* 165 Colo. 423, 439 P. 2d 342, the Supreme Court of Colorado considered the appeal of a defendant who had been convicted of the second-degree murder of his three-year-old stepson. The child's death occurred under circumstances strikingly similar to those disclosed by the record in the case now before us. In that case the defendant objected to the portion of the trial court's charge which reads as follows:

"If you should find beyond a reasonable doubt that death ensued from an attack made with the hands or feet, or otherwise, upon an infant of tender years, you are then instructed that under such circumstances malice may be implied."

In approving this instruction and affirming the conviction, the Court said (439 P. 2d, at 346):

"It is probably true, as a general rule, that where death ensues from an attack made with the hands or feet on a person of mature years, who is in good health, malice cannot be implied. Ordinarily, death would not be caused by such means. However, this general rule does not apply where such an assault with the hands or feet is committed on an infant of tender years or a person enfeebled by old age or disease. In such cases malice may be implied. *Balltrip v. People,* 157 Colo. 108, 401 P. 2d 259; *Milosevich v. People,* 119 Colo. 56, 199 P. 2d 895; *McAndrews v. People,* 71 Colo. 542, 208 P. 486, 24 A.L.R. 655."

The case of *Balltrip v. People, supra,* also presented a factual situation strikingly similar to that in the case presently before us. In that case defendant was charged with the murder of a three and one-half-year-old child, who died from head injuries. Defendant lived with the child's mother in a house

State v. Sallie

trailer and the child was injured while in defendant's care in the trailer. Defendant contended the child received his injuries by falling from a couch and striking his head on a stove. The State's evidence tended to show that the defendant attacked the child with his fists. In affirming defendant's conviction for second-degree murder the court approved an instruction that if the jury should find beyond a reasonable doubt "that death ensued from an attack made with the hands, or otherwise, upon an infant of tender years, you are then instructed that under such circumstances malice may be implied."

Other illustrative cases in which courts have approved the implication of malice required for second-degree murder from evidence of an attack by hands or feet alone, without use of other weapons, are: *Stockton v. State,* 239 Ark. 228, 388 S.W. 2d 382 (attack upon an eighty-nine-year-old woman) ; *People v. Kinzell,* 106 Ill. App. 2d 349, 245 N.E. 2d 319 (circumstantial evidence of an attack upon an eight-month-old infant; no evidence of any weapon) ; *Corbin v. State,* (Ind.) 234 N.E. 2d 261, reh. den. 237 N.E. 2d 376 (father's conviction for second-degree murder in killing of 21-month-old daughter by blows with his hand sustained by divided court; majority found sufficient evidence of malice) ; *Commonweath v. Buzard,* 365 Pa. 511, 76 A. 2d 394 (attack by large, powerful man upon small, weak man who was prone and defenseless) ; *Commonwealth v. Dorazio,* 365 Pa. 291, 74 A. 2d 125 (persistent attack upon victim who lay prostrate) ; See also cases reported in Annotation, "Inference of malice or intent to kill where killing is by blow without weapon," 22 A.L.R. 2d 854.

We have also carefully examined appellant's remaining assignments of error, all of which are directed to various portions of the court's charge to the jury. When the charge is considered as a whole it fairly presented the case to the jury, and we find no prejudicial error therein sufficient to justify awarding a new trial. In the entire trial and in the judgment imposed we find

No error.

Judges CAMPBELL and MORRIS concur.