STATE OF NORTH CAROLINA v. STANLEY MARVIN LANG

No. 205A83

(Filed 3 November 1983)

1. **Criminal Law § 76.5— admissibility of confession—voir dire hearing—necessity for findings**

    If there is no conflict in the evidence on voir dire or only immaterial conflicts, it is not error to admit a confession without making specific findings of fact, although it is always the better practice to find all facts upon which the admissibility of the evidence depends. However, when there is a material conflict in the evidence on voir dire, the judge must make findings of fact resolving any such material conflict.

**2. Criminal Law § 75.4— custodial interrogation after right to counsel invoked—admissibility of incriminating statements**

In cases in which the defendant was subjected to custodial interrogation in the absence of counsel after invoking his right to have counsel present during interrogation, defendant's incriminating in-custody statement is admissible only if it is found that (1) defendant initiated the further communication with the police which resulted in his incriminating statement and (2) defendant validly waived his right to counsel and to silence under the totality of the circumstances, including the circumstance that defendant reopened the dialogue with the police.

**3. Criminal Law § 76.6— admissibility of confession—insufficiency of findings of fact**

Where the evidence on voir dire showed that defendant was subjected to custodial interrogation in the absence of counsel after having invoked his right to have counsel present during interrogation, the trial court erred in ruling that defendant's confession was admissible without making specific findings of fact as to who initiated the contact between defendant and the law officers which resulted in his confession after defendant had invoked his right to have counsel present during custodial interrogation. Furthermore, the trial court erred in failing to make findings of fact resolving material conflicts in the voir dire testimony as to whether the investigating officers offered to release or not arrest a relative of defendant if defendant confessed or made threats against a relative if defendant refused to confess, and as to whether an officer slapped defendant on the head during custodial interrogation.

**4. Homicide § 24.1— use of hands or feet causing death—inference of malice—erroneous instructions**

The trial court in a murder prosecution erred in giving the jury instructions which permitted the jury to infer malice if it found only that defendant either kicked deceased or struck her with his hand and thereby proximately caused her death, since the fact that a defendant struck a person with his hand or kicked a person and proximately caused that person's death would not support either a presumption of malice as a matter of law or an inference of malice as a matter of fact unless the defendant was then using his hands or feet as deadly weapons.

**5. Homicide § 5— second degree murder—intent to kill**

While an intent to kill is not a necessary element of murder in the second degree, that crime does not exist in the absence of some intentional act sufficient to show malice and which proximately causes death.

**6. Homicide § 14— intentional use of deadly weapon—presumptions**

An intentional assault upon another with a deadly weapon which proximately causes death gives rise to two presumptions: (1) that the killing was unlawful and (2) that it was done with malice, and, nothing else appearing, the person who perpetrated such assault would be guilty of murder in the second degree.

**7. Homicide § 14— attack with hands or feet alone—presumption of malice**

Whether an attack made with hands or feet alone which proximately causes death gives rise to either a presumption of malice as a matter of law or to an inference of malice as a matter of fact will depend upon the facts of the particular case. For example, if an assault were committed upon an infant of tender years or upon a person suffering an apparent disability which would make the assault likely to endanger life, the jury could, upon proper instructions by the trial court, find that the defendant's hands or feet were used as deadly weapons, and, nothing else appearing, the trial court could properly instruct the jury that, should they find the defendant used his hands or feet as deadly weapons and *intentionally inflicted a wound upon the deceased prox-* imately causing his death, the law presumes that the killing was unlawful and done with malice.

**8. Homicide § 24.1— intoxicated victim—use of hands or feet as cause of death—heat of passion—instructions on presumptions of malice and unlawfulness**

Where defendant's confession in a murder case tended to show that decedent was a woman laboring under the disability of intoxication induced by alcohol and marijuana, that she was attacked by defendant and his companion who were both adult males, that both defendant and his companion kicked decedent with their feet and hit her with their hands, that the companion hit her with a baseball bat, that defendant kicked her in the stomach, hit her in the face and, using a knife given him by the companion, cut her on the back, and that the two men then threw her body into a ditch, and where there was also evidence which would support but not compel a finding that the killing was in the heat of passion suddenly aroused in that it tended to show that defendant was "rolling a joint" when a fight arose between decedent and the companion, defendant "got hit" and then kicked decedent, struck her with his hands and cut her on her back, and defendant was bitten on the arm at some point, the trial court should have instructed the jury (1) that if it found beyond a reasonable doubt that defendant intentionally assaulted the deceased with his hands, fists, or feet, *which were then used as deadly weapons,* the jury might infer first, that the killing was unlawful, and second, that it was done with malice, but the jury was not compelled to do so, and (2) that the jury could consider these facts along with all other facts and circumstances arising from the evidence in determining whether the killing in fact was unlawful and done with malice.

**9. Homicide § 24— instruction on inference of malice from total disregard for human life**

The evidence in this murder prosecution was sufficient to support a finding by the jury that defendant's acts indicated a total disregard for human life, and the State was thus entitled to an instruction that, if the jury found that the acts of defendant indicated a total disregard for human life and were intentionally done and proximately caused the death of the deceased, then the jury *might infer that the killing was unlawful and that it was done with malice,* but would not be compelled to do so. The jury should also have been instructed that it might consider this along with all other facts and circumstances arising

from the evidence in determining whether the killing was in fact unlawful and done with malice.

APPEAL of right from *Bruce, Judge*, presiding at the November 15, 1982, Criminal Session of Superior Court, CURRITUCK County. Heard in the Supreme Court September 14, 1983.

The defendant was charged in a bill of indictment, proper in form, with the murder in the first degree of Frances Mae Pack and entered a plea of not guilty. The jury returned a special verdict finding that North Carolina had jurisdiction as well as a verdict finding the defendant guilty of murder in the second degree. The trial court entered judgment sentencing the defendant to imprisonment for life. The defendant appealed to the Supreme Court as a matter of right pursuant to G.S. 7A-27(a).

*Rufus L. Edmisten, Attorney General, by M. R. Rich, Jr., Deputy Attorney General, and William B. Ray, Assistant Attorney General, for the State.*

*C. Everett Thompson and John G. Trimpi, for the defendant-appellant.*

MITCHELL, Justice.

In this appeal the defendant's dispositive assignments of error relate to the admission into evidence of his confession and to instructions by the trial court to the jury concerning the conditions under which the jury could infer malice. We find merit in these assignments and hold that the defendant must be allowed a new trial. Other errors assigned by the defendant are not likely to arise at a new trial and are neither reached nor discussed herein. Therefore, a complete recitation of the evidence presented at trial is unnecessary.

The State's evidence tended to show that the defendant, Stanley Marvin Lang, was observed in a restaurant and bar known as "Feldo's" in the Ocean View Section of Norfolk, Virginia early on the morning of April 20, 1982. He was in the company of Robert Linwood Taylor and Frances Mae Pack. The three of them had been drinking. Having had some conversation about smoking a marijuana cigarette, they left Feldo's shortly after 1:00 a.m. on April 20.

At approximately 5:45 a.m. on April 20, the nude body of Frances Mae Pack was found lying in a ditch on the side of Beachwood Shores Road about eight miles from the Virginia-North Carolina State Line, in or near Moyock, North Carolina. The body of Frances Mae Pack bore numerous external injuries including a large incised cut across the front of the neck about seven inches long and one-half inch in depth and numerous small incised cuts to the cheek and neck. A series of wounds produced by a blunt object were visible. The body also bore a series of wounds with a patterned surface which could have been produced by the tread of a tire, certain footwear or any firm object with a rigid corrugated pattern. There were also numerous cuts to the back, buttocks and arms of the body produced by a sharp instrument. Additionally, there were defensive cuts to the hands caused by a sharp instrument, together with numerous scratches and abrasions. Examination of the body also revealed wounds to the anal canal consistent with sodomy.

Frances Mae Pack died from a wound resulting from a blunt instrument impact on the right side of her head behind the ear causing a skull fracture and internal bleeding with aspiration of blood. The mortal wound was received approximately one-half hour prior to death.

The defendant and Taylor arrived at the defendant's home in Norfolk, Virginia during the early morning hours of April 20 and were seen there washing blood from their hands. The defendant then assisted Taylor in washing blood out of Taylor's van. A rag found in the defendant's yard later that day contained blood and hair consistent with the blood and hair of the deceased.

The defendant was interviewed by police officers at approximately 11:26 p.m. on April 22, 1982. At that time he gave a statement which tended to be exculpatory. Taylor was interviewed at approximately 12:25 a.m. on April 23, 1982 and denied any wrongdoing. He was again interviewed at approximately 1:30 p.m. on April 23 and gave an inculpatory statement which implicated the defendant. The defendant was again interviewed on two occasions on April 23. The defendant gave a statement in the nature of a confession during the second interview.

Other evidence introduced during the trial and pertinent to the defendant's appeal is reviewed later in this opinion where appropriate.

The defendant first assigns as error the admission into evidence of statements made by him to police officers while he was in custody. Prior to trial the defendant made a motion to suppress all statements made by him to law enforcement officers concerning this case. A hearing on the defendant's motion was held before Judge Herbert O. Phillips, III at the November 8, 1982, Session of Criminal Superior Court, Camden County, with the consent of the defendant and the State. The State and the defendant presented strongly conflicting evidence at the hearing. At the conclusion of the hearing, Judge Phillips made findings of fact and reached conclusions to the effect that the defendant freely, knowingly, intelligently and voluntarily made his inculpatory statement to the law enforcement officers. We are of the opinion that the findings of fact failed to resolve the conflicts arising from the evidence concerning certain controlling events and that this failure was prejudicial error.

The evidence for the State during the *voir dire* hearing on the defendant's motion to suppress tended to show that the defendant was first interviewed by law enforcement officers at approximately 11:26 p.m. on April 22, 1982. He was advised of his constitutional rights and, after waiving them, gave an exculpatory statement.

The defendant called Lawrence W. Hill, a narcotics investigator with the Norfolk Police Department by telephone and met with him between 7:00 p.m. and 8:00 p.m. on April 22. The defendant told Hill that he was a suspect in the murder and asked Hill to check into the matter. The defendant and his wife were acquainted with Hill because the defendant had been an informant for Hill for approximately two years after Hill had arrested the defendant on narcotics charges.

The defendant went to the office of an attorney in Virginia on the afternoon of April 23. The attorney called the Norfolk Police Department and learned that a warrant was being issued for the defendant's arrest. The attorney accompanied the defendant to the police station where he was arrested. At that time the defendant's attorney advised the police that defendant did not

wish to make any statement or talk to them without his attorney present.

The State's evidence also tended to show that Agent O. L. Wise of the North Carolina State Bureau of Investigation and Detective Tom Pollard of the Norfolk Police Department interviewed the defendant at approximately 6:25 p.m. on April 23. At that time the defendant was advised of his rights and informed the officers that he did not wish to talk to them or answer any questions without his lawyer present. All questioning of the defendant by Wise and Pollard was immediately terminated at that time.

At approximately 8:00 p.m. on April 23, Detective Hill had a discussion with the defendant who was in custody. Hill informed the defendant that he was not going to advise him of his rights, since he did not want to talk to the defendant about the matter under investigation. Hill told the defendant that he had read a statement by Taylor implicating the defendant and that he knew that the defendant had not made a statement. He then told the defendant that he wanted him to know that "all who's going to be looking out for you is you yourself." The defendant responded that he was not worried since he had not killed the girl but had only beaten her up. Hill and the defendant shook hands and Hill left.

After talking with his partner, Detective Hill concealed a radio transmitter on his person and went to the defendant's home to attempt to determine whether the defendant's wife had been involved in the murder. This was done without the knowledge of the officers investigating the murder. While Hill was in the home, the defendant called his wife. After learning from his wife that Hill was there, the defendant asked to speak to Hill and informed him that he wanted him to "get somebody" for the defendant to talk to. Hill suggested that, if the defendant wanted to talk to anybody, Detective Pollard would be a good man to talk to. As a result of this conversation, Hill called the Norfolk Police Department seeking Detective Pollard who had already gone home for the evening. Hill asked the person he spoke to to contact Detective Pollard. Detective Pollard was contacted and returned to see the defendant.

S.B.I. Agent Wise was returning to North Carolina when he received a radio message to call the Norfolk Police Department. When he called he was informed that Detective Pollard had received a telephone call requesting that they both return to the Norfolk Police Department as the defendant wanted to talk to them. Agent Wise testified that the defendant "told me when I went back to the Norfolk Police Department that he wanted to talk to me and tell me what happened, and I wanted to hear it." Agent Wise and Detective Pollard read the defendant his rights from a standard form. The defendant indicated that he understood his rights and wished to waive them and answer questions without an attorney present. The waiver of rights form was signed by the defendant and witnessed by the officers at approximately 10:00 p.m. on April 23. The defendant then made an inculpatory statement which was reported and transcribed by a stenographer. The officers indicated that they did not strike or threaten the defendant.

The defendant's evidence conflicted sharply with that of the State in several respects. The defendant testified that when he telephoned his wife, he discovered that Hill was with her. He talked with Hill by telephone and said, "I ain't telling nothing." He also testified that Hill told him that his wife and her sister were accessories to the murder and were going to be picked up. Hill asked him if he "had any place for the kids to go—downtown at a youth center or something." The defendant then told Hill that he wanted to talk to his lawyer before he said anything. Hill told the defendant that his wife's life was in danger but that Hill was not going to let anything happen to her or the children. The defendant's wife told him "that she was going to get fifty years in the penitentiary."

The defendant testified that later that evening Wise and Pollard came to see him. He told them that the only reason he was making a statement "was because they just said that Dora was going to get fifty years in the penitentiary and I was scared for her." The officers told the defendant at that time that they were going to contact his lawyer. Detective Pollard told the defendant that the lawyer was on his way but he never arrived.

The defendant also testified that the officers stopped his statement and started it over two or three times "because it

wasn't what they wanted." He made an inculpatory statement because, "I had no other choice; otherwise, they were going to pick up my wife." He said that Detective Pollard slapped him on the head at one point in the interview.

After the hearing on the defendant's motion to suppress his statements, Judge Phillips made findings of fact, concluded that the defendant's inculpatory statement was voluntarily and understandingly made and entered an order denying the defendant's motion to suppress. Those findings were insufficient to support the conclusions and order.

[1]  The general rule is that, at the close of a *voir dire* hearing to determine the admissibility of a defendant's confession, the presiding judge *should* make findings of fact to show the basis of his ruling. *State v. Riddick,* 291 N.C. 399, 230 S.E. 2d 506 (1976). If there is no conflict in the evidence on *voir dire* or only *immaterial* conflicts, it is not error to admit a confession without making specific findings of fact, although it is always the better practice to find all facts upon which the admissibility of the evidence depends. *Id.* In the present case, however, there were material conflicts in the evidence before the judge at the conclusion of the *voir dire* hearing of the defendant's motion to suppress. When there is a *material* conflict in the evidence on *voir dire,* the judge *must* make findings of fact resolving any such material conflict. *Id.* The findings in the present case failed to resolve all material conflicts in the evidence.

Certain of the findings in the order denying suppression are more correctly described as recitations of testimony presented at the hearing. They do not resolve conflicts in the evidence but are merely statements of what a particular witness said. Although such recitations of testimony may properly be included in an order denying suppression, they cannot substitute for findings of fact resolving material conflicts.

For example, there was no specific finding as to who initiated the contact between the defendant and law enforcement officers after the defendant had invoked his right to have counsel present during custodial interrogation. The presiding judge found in this regard that:

22. It was Agent Wise's understanding at that time that Mr. Lang had called for him and Detective Tom Pollard to

come back to the Norfolk Police Department and talk with him, the defendant.

23. It was also Agent Wise's understanding that the defendant initiated the conversation.

Although these findings establish what Agent Wise understood, the presiding judge inadvertently failed to make a specific finding with regard to the contested material fact of who actually initiated the conversation with the defendant. This inadvertence was fatal.

In *Edwards v. Arizona,* 451 U.S. 477, *reh'g denied,* 452 U.S. 973 (1981), the Supreme Court of the United States held

that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication,* exchanges, or conversations with the police.

451 U.S. 484-485 (emphasis added). The Supreme Court has more recently stated that this statement in *Edwards* established "in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was." *Oregon v. Bradshaw,* --- U.S. ---, ---, 103 S.Ct. 2830, 2834, 77 L.Ed. 2d 405, 411 (Plurality opinion) (1983). Thus, the holdings in *Edwards* and *Bradshaw* make it crucial that there be a finding of fact as to who initiated the communication between the defendant and the officers which resulted in his inculpatory statement while in custody and after he had invoked the right to have counsel present during interrogation.

[2, 3] Even if the communication leading to the confession was initiated by the defendant, however, the inquiry and need for findings of fact does not end. "[T]he burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the in-

terrogation." *Oregon v. Bradshaw,* --- U.S. at ---, 103 S.Ct. at 2834, 77 L.Ed. 2d at 412. This was made clear in the following footnote to the *Edwards* opinion:

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, *whether* the purported waiver was knowing and intelligent and *found to be so* under the *totality of the circumstances, including* the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

451 U.S. at 486 n. 9 (emphasis added). Therefore, in cases such as this in which the defendant was subjected to custodial interrogation in the absence of counsel after invoking his right to have counsel present during interrogation, the inquiry may not end with a finding that the defendant initiated the later dialogue between himself and the police. The judge presiding must go further and make findings and conclusions establishing whether the defendant validly waived the right to counsel and to silence under the totality of the circumstances, including the circumstance that the accused reopened the dialogue with the authorities. If the presiding judge finds that the accused did not initiate the further dialogue with the authorities, however, the prophylactic rule applies and the confession must be excluded without reaching a consideration of the totality of the circumstances. *Oregon v. Bradshaw,* --- U.S. ---, 103 S.Ct. 2830, 77 L.Ed. 2d 405 (1983).

The phrase "totality of the circumstances" as used in *Edwards* and *Bradshaw* clearly includes all circumstances material to a determination of whether the defendant engaged in a knowing, intelligent and valid waiver of the right to counsel and the right to silence, including the necessary fact that the accused reopened the dialogue with the authorities.

Should the defendant challenge the admissibility of the confession at a new trial, the judge hearing the motion will also be required to make findings resolving other material conflicts in the evidence. The defendant testified that he told Officer Hill by telephone that, "I ain't telling nothing." He testified that Hill then

told him that his wife and her sister were accessories to the murder and were going to be picked up and that Hill asked whether a youth center or some other place would be appropriate for placement of the defendant's children. Officer Hill testified that he never discussed such matters with the defendant.

The presiding judge found that Officer Hill made a statement to the defendant's wife that, "This is capital murder and the punishment for this is the death penalty. This ain't playing games. And just being an accessory to it is just like about 50 years in the penitentiary." The presiding judge also found that Hill at no time spoke directly to the defendant about the possibility that his wife could be charged as an accessory.

"A statement by investigating law enforcement officers that a suspect's relatives will be released from custody or not be arrested if the suspect confesses may, under the totality of the circumstances, render the suspect's resulting confession involuntary." *State v. Branch*, 306 N.C. 101, 107, 291 S.E. 2d 653, 658 (1982). It is generally held, however, that a mere desire of a defendant to protect a relative will not render his confession inadmissible where the desire to protect the relative and the hope of being able to do so was not suggested by the police but originated with the accused. *See generally*, Annot. 80 A.L.R. 2d 1428, §§ 6, 7 and 8 (1961). Of particular importance, for example, will be whether the investigating officers offered to release or not arrest a relative if the defendant confessed or made threats against the relative if the defendant refused to confess. *State v. Branch*, 306 N.C. at 108-09, 291 S.E. 2d at 659. Should the defendant seek to have his confession excluded at a new trial, material issues of fact concerning the alleged statements relative to his wife and sister-in-law must be made and appropriate conclusions reached.

The defendant testified that, at one point during the interview with the officers at which he confessed, Detective Pollard slapped him on the head. The officers testified that this did not occur. Appropriate findings must be made and conclusions reached on this contested material fact, should the defendant challenge the admissibility of his confession at a new trial.

The presiding judge's failure to find facts resolving certain material conflicts in the *voir dire* testimony was prejudicial error. Where there is such prejudicial error involving issues or matters

not fully determined by the lower court, an appellate court may remand the cause for appropriate proceedings without ordering a new trial. *State v. Booker,* 306 N.C. 302, 313, 293 S.E. 2d 78, 84 (1982). As we find other prejudicial error which will require a new trial of this case, however, all matters at issue will again be before the trial court and such remand is unnecessary.

[4] The defendant next assigns as error a portion of the trial judge's final instructions to the jury which he contends permitted the jury to infer the malice necessary to elevate the killing in question to murder in the second degree solely upon the jury's finding that the defendant kicked the deceased or struck her with his hand. In his final instructions to the jury, the trial judge defined "malice" and then instructed the jury as follows:

> If the state proves, beyond a reasonable doubt, or if it's admitted that the defendant intentionally kicked, cut or struck Frances May Pack, thereby proximately causing Miss Pack's death, you may infer first that the killing was unlawful and second, that it was done with malice. But, you are not compelled to do so. You may consider this along with other facts and circumstances in determining whether the killing was unlawful and whether it was done with malice.

This instruction was prejudicial error and a new trial is required.

The quoted portions of the instructions by the trial judge permitted the jury to infer malice if it found *only* that the defendant *either* kicked, cut *or* struck the deceased and thereby proximately caused her death. The State argues that the challenged portion of the trial judge's instructions did not invoke a presumption or inference of malice as a matter of law, but merely permitted the jury to infer malice as a matter of fact. The State is correct in its assertion, but we do not find it controlling. The fact that a defendant struck a person with his hand or kicked a person and proximately caused that person's death would not support either a presumption of malice as a matter of law or an inference of malice as a matter of fact unless the defendant was then using his hands or feet as deadly weapons.

[5, 6] While an intent to kill is not a necessary element of murder in the second degree, that crime does not exist in the absence of some intentional act sufficient to show malice and

which proximately causes death. *State v. Wilkerson,* 295 N.C. 559, 247 S.E. 2d 905 (1978). An intentional assault upon another with a deadly weapon which proximately causes death gives rise to two presumptions: (1) that the killing was unlawful and (2) that it was done with malice and, nothing else appearing, the person who perpetrated such assault would be guilty of murder in the second degree. *State v. Benton,* 299 N.C. 16, 260 S.E. 2d 917 (1980).

As Judge Parker speaking for the Court of Appeals has correctly pointed out:

It is true that ordinarily if death ensues from an attack made with hands and feet only, on a person of mature years and full health and strength, the law would not imply malice required to make the homicide second-degree murder. This is so because, ordinarily, death would not be caused by use of such means. The inference would be quite different, however, if the same assault were committed upon an infant of tender years or upon a person infeebled by old age, sickness, or other apparent physical disability.

*State v. Sallie,* 13 N.C. App. 499, 510, 186 S.E. 2d 667, 674, *cert. denied,* 281 N.C. 316, 188 S.E. 2d 900 (1972). Justice (later Chief Justice) Ruffin speaking for this Court expressed a similar view by stating that:

An instrument, too, may be deadly or not, according to the mode of using it, *or the subject on which it is used.* For example, in a fight between men, the fist or foot would not, generally, be regarded as endangering life or limb. But it is manifest, that a wilful blow with the fist of a strong man, on the head of an infant, or the stamping on its chest, producing death, would import malice *from the nature of the injury, likely to ensue.*

*State v. West,* 51 N.C. 505, 509 (1859) (emphasis added).

[7] Whether an attack made with hands or feet alone which proximately causes death gives rise to either a presumption of malice as a matter of law or to an inference of malice as a matter of fact will depend upon the facts of the particular case. For example, if an assault were committed upon an infant of tender years or upon a person suffering an apparent disability which would make the assault likely to endanger life, the jury could,

upon proper instructions by the trial court, find that the defendant's hands or feet were used as deadly weapons. Nothing else appearing, the trial court properly could instruct the jury that, should they find the defendant used his hands or feet as deadly weapons and intentionally inflicted a wound upon the deceased proximately causing his death, the law presumes that the killing was unlawful and done with malice. *See State v. West*, 51 N.C. 505 (1859); *State v. Sallie*, 13 N.C. App. 499, 186 S.E. 2d 667, *cert. denied*, 281 N.C. 316, 188 S.E. 2d 900 (1972) and cases cited therein. *See generally* Annot. 22 A.L.R. 2d 854 (1952).

If, after the mandatory presumptions arise, there is no evidence that the killing was in the heat of passion on sudden provocation or in self-defense, our law requires that the jury be instructed that the defendant must be convicted of murder in the second degree. But

[i]f, on the other hand, there is evidence in the case of all the elements of heat of passion on sudden provocation the mandatory presumption of malice disappears but the logical inferences from the facts proved remain in the case to be weighed against this evidence. If upon considering all the evidence, including the inferences and the evidence of heat of passion, the jury is left with a reasonable doubt as to the existence of malice it must find the defendant not guilty of murder in the second degree and should then consider whether he is guilty of manslaughter.

*State v. Hankerson*, 288 N.C. 632, 651, 220 S.E. 2d 575, 589 (1975), *reversed on other grounds*, 432 U.S. 233 (1977).

[8] In the present case, the defendant's confession tended to show that the deceased was a woman laboring under the disability of intoxication induced by alcohol and marijuana. She was attacked by the defendant and Taylor, two adult males assisting each other. Both the defendant and Taylor kicked the deceased with their feet and hit her with their hands. Taylor beat her with a baseball bat. The defendant kicked her in the stomach, hit her in the face and, using a knife given him by Taylor, cut her on the back. The two men then threw her body into a ditch.

Under this evidence, *nothing else appearing*, the trial court properly could have instructed the jury that, if they found from

the evidence and beyond a reasonable doubt that the defendant intentionally assaulted the deceased with his hands, fists, or feet, *which were then used as deadly weapons,* and that her death was a proximate result of his acts, then the law presumes malice and the defendant must be convicted of murder in the second degree. Here, however, there was also evidence which would support but not compel a finding that the killing was in the heat of passion suddenly aroused. The defendant stated in his confession that he was "rolling a joint" when a fight arose between the deceased and Taylor. The defendant "got hit" and then kicked the deceased, struck her with his hands and cut her on her back. There was also evidence tending to show that the defendant was bitten on the arm at some point.

Since there was evidence of a killing in the heat of passion suddenly aroused, the mandatory presumptions of malice and unlawfulness disappear. Therefore, the trial court should have instructed the jury that if they found from the evidence and beyond a reasonable doubt that the defendant intentionally assaulted the deceased with his hands, fists, or feet, *which were then used as deadly weapons,* the jury might infer first, that the killing was unlawful, and second, that it was done with malice, but the jury was not compelled to do so. The jury then should have been instructed that they could consider these facts along with all other facts and circumstances arising from the evidence in determining whether the killing in fact was unlawful and done with malice.

We also note that the instructions given by the trial court did not tend to focus upon whether the cuts on the back of the deceased were administered with a weapon or upon whether any such weapon was a deadly weapon per se or used as a deadly weapon. At the time of any new trial of this case, the trial court will be required to go into these questions based upon the evidence presented and give such instructions as are required by the evidence.

[9] We further note that the evidence presented at trial would have justified an instruction concerning the permissible inference of malice which the jury might properly draw if it found that the defendant's acts indicated a total disregard for human life. This Court has said:

[A]ny act evidencing "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person" is sufficient to supply the malice necessary for second degree murder. Such an act will be accompanied by a general intent to do the act itself but it need not be accompanied by a specific intent to accomplish any particular purpose or do any particular thing.

*State v. Wilkerson*, 295 N.C. at 581, 247 S.E. 2d at 917 (1978).

The evidence presented was sufficient to support a finding by the jury that the defendant's acts indicated a total disregard for human life. Based on this evidence, the State was entitled to an instruction that, if the jury found that the acts of the defendant indicate a total disregard for human life and were intentionally done and proximately caused the death of the deceased, then the jury might infer that the killing was unlawful and that it was done with malice, but would not be compelled to do so. *See State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978). The jury then should also be instructed that it might consider this along with all other facts and circumstances arising from the evidence in determining whether the killing was in fact unlawful and done with malice.

For the reasons stated herein, we order that the defendant be granted a

New trial.