STATE OF NORTH CAROLINA
v.
HEZZIE RANDALL LOCKLEAR, SR. HEZZIE RANDALL LOCKLEAR, JR. Defendants
No. COA05-479
North Carolina Court of Appeals
Filed February 7, 2006
This case not for publication
Robeson County No. 00 CRS 644-647.
Attorney General Roy Cooper, by Assistant Attorney General Steven F. Bryant and Special Deputy Attorney General Jonathan P. Babb, for the State.
Thomas K. Maher for defendant-appellant Hezzie Randall Locklear, Sr. Glover & Petersen, by Ann B. Petersen, for defendant-appellant Hezzie Randall Locklear, Jr.
SMITH, Judge.
Hezzie Randall Locklear, Sr. ("Senior") and Hezzie Randall Locklear, Jr. ("Junior") (collectively, "defendants") appeal their convictions for first degree murder and robbery with a dangerous weapon. For the reasons discussed herein, we conclude defendants received a trial free of prejudicial error.
The evidence presented at trial tends to show the following: After being released from the Hoke County jail on 21 December 1999, Senior was picked up by his wife, her daughter, Connie, and Connie's husband Dexter Hardin ("Dexter"). Later that evening after Connie and Dexter Hardin left his residence, Senior smoked some crack cocaine and drank nine to ten beers. Around ten or eleven o'clock p.m., Dexter called Senior seeking a ride and told Senior he had some crack cocaine. Senior advised Dexter there were no cars at Senior's home. The two agreed each would start walking, meet halfway, and walk back to Senior's house and smoke the crack. Junior walked with Senior. They saw Mickey Lowry ("Mickey") getting out of his car at his residence and walked to Mickey's house. While at Mickey's house, defendants were invited inside where they drank beer and talked with Mickey. A verbal disagreement escalated into a fight when Mickey pulled a gun from his back pocket. Mickey was fatally wounded.
Hosea Oxendine ("Oxendine") testified he was visiting a friend at a location approximately one mile from Mickey's house when defendants approached him in the early morning hours on 22 December 1999 and asked for a ride. Oxendine, who knew both defendants, noticed they were acting nervous. Defendants offered Oxendine one hundred dollars for the ride and he drove defendants to a trailer approximately one quarter mile away. Both defendants gave Oxendine money and Oxendine noted both men had plenty of cash. Defendants stated they had made a "quick hustle." During the trip, defendants asked Oxendine if he knew anyone who wanted to buy some guns because they had two to sell and one was a ".38[.]"
Larkey Lowry ("Larkey") testified that on the evening of 23 December 1999, he went to his brother Mickey's house because he was concerned that the lights had been on for several days but Mickey had not been around. Larkey found the door unlocked and entered the house. He discovered Mickey lying face down in the bedroom. There were signs of a struggle and the house had been ransacked. Larkey saw several guns lying on the floor, and noted several drawers were open with "stuff throw[n] out." Larkey knew Mickey usually kept "anywhere from six to $7,000.00 in his pocket." Larkey also noted some rings, a gold nugget watch, some bracelets, a .22 rifle, a .22 automatic rifle, a . 32 caliber pistol, a .38 caliber pistol and a .22 caliber pistol were missing.
An autopsy revealed Mickey was shot three times and strangled. Dr. John D. Butts, chief medical examiner for the State, testified that in his opinion the victim died as a result of the gunshot wounds and strangulation.
Chauncey Burke testified that he went with Junior to pick up some firearms from a ditch on Solomon Road on 23 December 1999. The guns were in a ditch across the road from Mickey Lowry's house. Junior told Chauncey Burke he had gotten the weapons from Bladenboro, North Carolina.
In December 1999, Junior sold a gun to Trellis Mack for one hundred and fifty dollars. Charlie Lowry obtained the same weapon from Cora Lee Hammonds. Charlie Lowry was familiar with the weapon because he had tried to buy it from Mickey Lowry. After obtaining the gun, Charlie Lowry turned it over to the sheriff's department. On 7 January 2000, defendants were taken to the Robeson County Sheriff's Department and questioned. Both made statements admitting they were at Mickey Lowry's house the night he was killed. Their statements differed, however, as to how Mickey was fatally wounded.
At trial, the State introduced a redacted version of Senior's pretrial statement that omitted all references to Junior. In the redacted statement, Senior admitted being in the home, grabbing Mickey's hand, knocking the gun in Mickey's hand to the floor, and hearing the gun discharge.
The State also introduced a redacted version of Junior's pretrial statement which omitted all references to Senior. In the redacted statement Junior admitted pushing Mickey back on the couch, hearing the gun fire, and firing a shot at Mickey in the bedroom.
Both defendants testified at trial. Senior testified Junior punched Mickey in the face when Mickey told them to leave, the two started fighting, and Mickey pulled a gun from his pocket. Senior knocked the gun to the floor, causing it to fire. Senior left the house and returned to find Mickey on the bedroom floor with Junior standing over him holding a gun. Senior took the gun to stop Junior and the gun went off accidentally, wounding Mickey in the back. Junior then shot Mickey twice with another gun and Senior left the house with Junior behind him. Senior denied either defendant took any weapons from the house.
Junior testified that Senior and Mickey had a heated argument. Mickey pulled a gun out his pocket when Senior stood up and Senior slapped the gun to the floor causing it to discharge. Senior and Mickey fought and Mickey ended up face down and Senior was on top choking Mickey. Senior shot Mickey in the back. Junior left the house and heard two more gunshots from inside the house. Senior came out carrying a rifle and three pistols belonging to Mickey, which he threw into the ditch across the road when Junior refused to have anything to do with them.
On rebuttal, the State introduced each defendant's entire pretrial statement.
On 11 December 2002, a jury found defendants guilty of first degree murder under the felony murder rule and robbery with a dangerous weapon. The trial court arrested judgment on the robbery convictions and sentenced each defendant to life imprisonment without parole on the murder convictions. Defendants appeal.
Initially, we note defendants have failed to present arguments supporting all of their assignments of error. Pursuant to N.C.R. App. P. 28(b)(6), the assignments of error for which no argument is made are deemed abandoned. Our review, therefore, is limited to the assignments of error properly preserved by defendants on appeal.
The issues on appeal are whether the trial court: (I) erred by granting the State's motion for joinder and denying defendants' motions for severance; (II) erred by denying Junior's motion to suppress; and (III) committed plain error by allowing testimony concerning Junior's willingness to take a polygraph test.
Both defendants contend the trial court erred in granting the State's motion to join the cases for trial and denying defense motions for severance made prior to trial and during trial. We disagree.
N.C. Gen. Stat. § 15A-926 permits joinder of charges against multiple defendants when "the offenses charged are 'part of the same act or transaction' or are 'so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.'" State v. Fink, 92 N.C. App. 523, 527, 375 S.E.2d 303, 306 (1989) (quoting N.C. Gen. Stat. § 15A-926(b)(2) (1988)). "There is a strong policy in North Carolina favoring the consolidation of the cases of multiple defendants at trial when they may be held accountable for the same criminal conduct." State v. Barnes, 345 N.C. 184, 220, 481 S.E.2d 44, 63 (1997), cert. denied 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). However, N.C. Gen. Stat. § 15A-927(c)(2) (2003) requires severance when it is necessary for "a fair determination of the guilt or innocence of one or more defendants[.]" Whether the defendants should be tried jointly or separately is a question within the sound discretion of the trial judge and will not be disturbed on appeal without a showing that joinder has deprived a defendant of a fair trial. State v. Tirado, 358 N.C. 551, 565, 599 S.E.2d 515, 526 (2004), cert. denied Queen v. North Carolina, __ U.S. __, 161 L. Ed. 2d 285 (2005).
In the instant case, both defendants argue that joinder led to the introduction of redacted statements that, in turn, led to "an impermissible combat between defendants" because their defenses were "not only antagonistic but irreconcilable." Senior also argues joinder "deprived [him] of exculpatory evidence that would have been admissible at a [separate] trial, and ultimately forced [Senior] to forgo his Fifth Amendment rights and testify." In addition, Junior argues joinder led to a redacted statement that distorted his role in the events. Defendants have failed to show that the trial court abused its discretion in consolidating their trials or that they did not receive a fair trial.
"The fact that defendants in a joint trial may offer antagonistic or conflicting defenses does not necessarily warrant severance." State v. Pendergrass, 111 N.C. App. 310, 315, 432 S.E.2d 403, 406 (1993). Neither is severance appropriate "merely because the evidence against one codefendant differs from the evidence against another." Barnes, 345 N.C. at 220, 481 S.E.2d at 63. "The test is whether the conflict in defendants' respective positions at trial is of such a nature that, considering all of the other evidence in the case, defendants were denied a fair trial." State v. Nelson, 298 N.C. 573, 587, 260 S.E.2d 629, 640 (1979) cert. denied, 446 U.S. 929, 64 L. Ed. 2d 282 (1980). The focus is whether the defendants suffered prejudice. State v. Rasor, 319 N.C. 577, 583, 356 S.E.2d 328, 332 (1987).
"Prejudice would ordinarily result where codefendants' defenses are so irreconcilable that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty. . . . Severance should ordinarily be granted where defenses are so discrepant as to pose an evidentiary contest more between defendants themselves than between the state and the defendants. . . . To be avoided is the spectacle where the state simply stands by and witnesses a combat in which the defendants [attempt] to destroy each other.
Nelson, 298 N.C. at 587, 260 S.E.2d at 640 (1979).
We are not persuaded by defendants' assertion that their antagonistic defenses mandated severance in the instant case. "No prejudice results where the state presents plenary evidence of defendant's guilt, apart from the co-defendant's testimony, and where defendant has the opportunity to cross-examine the co-defendant." Rasor, 319 N.C. at 583, 356 S.E.2d at 332. Here, the State's evidence tended to show: the victim usually carried large sums of cash on his person and money was missing; several weapons were missing from the residence; both defendants were present when the victim was wounded; and defendants were seen with large sums of cash in the early morning hours following the victim's death. The State also presented evidence that both defendants were seeking to sell weapons. "Clearly this was not a case in which the state stood idly by and relied on the testimony of each defendant to convict the other or in which the jury was likely to infer from the conflict that both defendants were guilty." Id.
We also are not persuaded by Senior's argument that joinder deprived him of exculpatory evidence. Senior argues "the joint trial resulted in a substantial redaction of the substance of [his] pre-trial statement [which] made clear that [he] had no intentional involvement in the death of Lowry and that Junior was the culpable party." Although Senior argues his participation was passive, the evidence against him at trial was sufficient to go to the jury on a theory of acting in concert or aiding and abetting. "Any passivity on the part of [Senior] was a consideration more appropriate for sentencing." Barnes, 345 N.C. at 223-24, 481 S.E.2d at 65.
Junior argues his "description of being a largely passive participant in the events that [led] to Mick[e]y's death and which involved a robbery which Junior had no part of was unfairly transformed" in the redacted statement, resulting in prejudice to Junior. We find Junior's argument that he was deprived of a fair trial unpersuasive as well. In Junior's redacted statement and the full version which was admitted after Junior testified, he states he in fact fired one shot at the victim. Such evidence does not indicate Junior was "a largely passive participant". The assignment of error is overruled.
Junior also argues the trial court erred by denying his motion to suppress his pretrial statement. We disagree.
The State has the burden of demonstrating the admissibility of evidence at a hearing on a motion to suppress. State v. Tarlton, 146 N.C. App. 417, 420, 553 S.E.2d 50, 53 (2001). "In reviewing the trial court's ruling on a suppression motion, we determine only whether the trial court's findings of fact are supported by competent evidence, and whether these findings of fact support the court's conclusions of law." Id. (citations omitted). Where the trial court's findings of fact support the court's conclusions of law, the conclusions are binding on appeal.Id.
On 5 November 2002, Junior filed a motion to suppress statements he made to law enforcement officers alleging the statements were illegally and unconstitutionally obtained because after Junior invoked his right to counsel, law enforcement officers initiated further communication with him. Junior also alleges his ultimate decision to sign a waiver of his rights and make a statement was the product of repeated threats to arrest his girlfriend and have her children removed from the home by the Department of Social Services.
The trial court conducted a voir dire hearing on Junior's motion to suppress. Special Agent Mitch Deaver ("Agent Deaver") of the North Carolina State Bureau of Investigation testified that on 7 January 2000 he and other law enforcement officers went to the Locklear residence and took Junior and Senior to the Sheriff's office for questioning. Junior requested to speak with an attorney prior to speaking with the investigators. At Junior's request, the officers contacted Attorney Musselwhite who advised Junior. Following Junior's conversation with the attorney, Junior told Agent Deaver the attorney had advised him not to say anything but Junior also said, "I think I'll tell it, anyway." Junior then asked if he could visit with his fiancée, Beth Locklear who was at the Sheriff's Department. After meeting with Ms. Locklear, Junior stated that he did not wish to make a statement. Agent Deaver informed Junior that Senior had made a statement and that based on Senior's statement there was enough to charge Junior. Junior again declined to make a statement. Agent Deaver then informed Junior he was under arrest. After Junior was arrested, Agent Bullard was asked by Junior if he could help him. Agent Bullard thought that Junior asked him if he could assist him with the sentence. Agent Bullard told Junior he could not make any assurances, and Junior then stated that he was ready to talk; and Agent Bullard got Agent Deaver. Junior was advised of his Miranda rights and signed a waiver.
Junior testified that his refusal to talk was met with repeated comments containing threats to arrest his girlfriend Beth, and to charge her even though she had no involvement in anything and have her kids taken by DSS, and statements to the effect that they would just let her go home if he told them what happened. Junior testified that he asked Agent Bullard to come into the room in response to Bullard's comments outside the door that Junior was "sorry" for allowing law enforcement to question his girlfriend.
Junior contends the trial court failed to make adequate findings of fact as to whether Junior initiated dialogue with the investigating officers after having invoked his right to counsel and, if so, whether he voluntarily waived his rights to silence and counsel considering the totality of the circumstances as required by State v. Lang, 309 N.C. 512, 522, 308 S.E.2d 317, 322 (1983).
"The general rule is that, at the close of a voir dire hearing to determine the admissibility of a defendant's confession, the presiding judge should make findings of fact to show the basis of his ruling." Lang, 309 N.C. at 520, 308 S.E.2d at 321. Where there is no conflict or immaterial conflicts in the evidence on voir dire, the trial court is not required to make specific findings; however, where there is a material conflict, "the judge must make findings of fact resolving any such material conflict." Id.
In the instant case, we are persuaded the trial court's findings resolve all material conflicts in the evidence. The trial court made the following findings of fact:
In the late evening hours of January 7th, 2000, Special Agent Mitchell Deaver, SBI agent, along with other officers, acting upon information received shortly before that time, went to the defendant's residence to question him and his father, Hezzie Randall Locklear, Sr., about the robbery and murder of Mick[ey] Lowry.
The officers located the defendant and his father at the residence, along with other persons.
. . .
[T]he defendant was taken by the officers from his residence and transported to the Robeson County Sheriff's Department and, thereafter, questioned by Special Agent Deaver.
. . .
[T]he defendant Hezzie Randall Locklear, Jr. indicated that he did not want to make a statement until he spoke with his father.
. . .
[A]fter the defendant spoke with his father, the defendant asked the officers to call an attorney for him.
. . .
After two unsuccessful attempts to reach an attorney, the officers were able to reach J.W. Musselwhite, a[n] attorney who was representing the defendant in a pending civil matter.
. . .
The defendant spoke over the phone with J.W. Musselwhite, whereupon Mr. Musselwhite advised the defendant to not make a statement to the officers.
. . .
Sometime thereafter, the defendant told the officers that he would talk to them in spite of Mr. Muselwhite telling him not to.
. . .
The defendant was thereafter allowed to speak in private to his girlfriend, Elizabeth Ann Locklear.
. . .
The defendant, thereafter, told Special Agent Deaver that he had thought about it and decided not to give a statement.
. . .
Thereafter, Special Agent Deaver read to the defendant his Miranda rights at 2:25 a.m., and the defendant refused to sign the rights form and again refused to make a statement to the officer.
. . .
Special Agent Deaver informed the defendant that he was under arrest for the robbery and murder of Mickey Lowery.
. . .
[T]he defendant . . . remained in the interview room for a period of time. While in the interview room, he contacted Special Agent Bullard, suggesting that he was ready to talk to the officers.
. . .
Special Agent Bullard contacted Special Agent Deaver, whereupon the officers again advised the defendant of his rights at 3:15 a.m., and the same was signed by the defendant.
. . .
Thereafter, the defendant made statements to the officers that tended to incriminate himself.
. . .
The defendant was thereafter taken to the magistrate at 5:30 a.m.
The findings recited above indicate the trial judge resolved the conflicts in the evidence against defendant. See State v. Jenkins, 311 N.C. 194, 202-03, 317 S.E.2d 345, 350 (1984). We are bound by the trial court's findings. State v. Barnett, 307 N.C. 608, 614, 300 S.E.2d 340, 344 (1983). Based on the foregoing findings of fact, the trial court concluded as a matter of law:
that while the defendant, Hezzie Randall Locklear, Jr., was in custody during his interrogation, that the defendant, nevertheless, knowingly waived his right to an attorney and gave a statement to the officers. And that that statement was voluntary and not coerced by any officer.
We conclude there was ample competent evidence to support the trial court's findings of fact and the findings of fact support the conclusions of law that Junior waived his right to an attorney and that his statement was voluntary and not coerced. The assignment of error is thus overruled.
Next, Senior contends the trial court committed plain error in allowing evidence of Junior's willingness to take a lie detector test. Under plain error review, Senior must establish that the trial court committed a fundamental error and that absent the fundamental error, it is likely the jury would have reached a different result. State v. Jones, 355 N.C. 117, 125, 558 S.E.2d 97, 103 (2002).
"The results of polygraph testing have been held inadmissible in North Carolina . . . . However, the mere mention of polygraph testing does not necessitate appellate relief." State v. Mitchell, 328 N.C. 705, 711, 403 S.E.2d 287, 291 (1991).
In the instant case, Junior testified he wrote Captain Patterson and requested to take a "lie detector" test to prove his second statement to police was true. Senior's counsel questioned Junior concerning his written requests to Captain Patterson. No results of any polygraph test were introduced in evidence. Assuming arguendo that the trial court's decision to allow Junior's testimony that he was willing to take a polygraph test was error, we nevertheless conclude Senior has failed to meet the heavy burden of plain error review by showing that absent the error, the jury likely would have reached a different result. The assignment of error is overruled.
No error.
Judges WYNN and STEELMAN concur.
Report per Rule 30(e).