STATE OF NORTH CAROLINA v. WALTER LEE ROY JONES

No. 7720SC398

(Filed 17 January 1978)

**1. Homicide § 21.7— spanking baby—second degree murder—sufficiency of evidence**

Evidence was sufficient to support a verdict finding defendant guilty of second degree murder where it tended to show that the twenty month old infant victim was alive and well before being left alone with defendant, the husband of the child's mother; three and a half hours later the child was dead; during that entire time the child and defendant were alone together; the child's death resulted from a trauma sufficiently severe to tear his liver almost in two; defendant required the baby to stand at attention for a protracted period; and defendant admitted that he spanked the baby and hit the baby hard.

**2. Homicide § 14.1— attack on infant with hands—malice implied**

The malice required for second degree murder may be implied from evidence that the victim's death resulted from an attack by hands alone, without use of other weapons, when the attack was made by a mature man upon a defenseless infant.

APPEAL by defendant from *Gavin, Judge.* Judgment entered 24 February 1977 in Superior Court, STANLY County. Heard in the Court of Appeals 29 September 1977.

Defendant was tried on his plea of not guilty to an indictment charging him with the first degree murder of Michael Leak, the twenty-month old son of defendant's wife. The child was born approximately one year prior to the marriage of defendant and Vivian Leak Jones, the child's mother.

The State presented evidence to show: On 16 January 1977 Henrietta Williams and Floyd Ingram visited in the home of defendant and his wife, arriving sometime between 6:00 and 7:00 p.m. About 7:00 p.m. Vivian Leak Jones purchased a half-pint of vodka for defendant. About 8:30 p.m. Miss Williams and Mrs. Jones left the house. When they left, Michael appeared to be healthy and uninjured. Ingram noticed that Michael was somewhat irritable, and he observed defendant spanking the child on the leg with a plastic comb. Defendant told Michael to be quiet and then made him stand at attention. Ingram left the house at approximately 9:30 p.m. When he left, Michael was still standing

at attention and had been standing at attention approximately five to fifteen minutes. The child was uninjured when Ingram left.

Mrs. Jones returned to the house alone at approximately 1:00 a.m. to find defendant and Michael lying on the same bed. Defendant was asleep, and after being awakened, he and Mrs. Jones drank two beers each as they talked and watched television. After drinking the beers, defendant went into the bathroom, and Mrs. Jones walked over to the bed where Michael was lying to check on him. She then discovered that Michael was not breathing. Mrs. Jones did not move the child; she only felt to see if he was breathing. She called to defendant, and he returned immediately to the bedroom to check on Michael. Defendant lifted the child, looked in his eyes, and touched his chest area. Mrs. Jones observed no injuries on Michael, but there was some blood on his diaper.

Leaving the dead child in the house, both defendant and Mrs. Jones went to a neighbor's house to call the police. When Henry Griffin, a police officer, arrived at the house at approximately 2:30 a.m., defendant appeared calm and unemotional, and he did not appear to be under the influence of any intoxicating beverage. The only light in the bedroom came from the television, which was still on. Michael's body was still on the bed. While Officer Griffin examined the body, defendant sat and watched television. The television was quite loud, and Officer Griffin's partner had to ask defendant to lower the volume on the television so he could obtain information from defendant. Officer Griffin observed that Michael had a swollen and slightly scratched upper lip and a small blood spot under each nostril. He also described a bloody spot or streak on the bed "where it appeared the child had been drug across the bed."

The pathologist who performed an autopsy on 17 January 1977 testified that there were large, apparently diluted, blood stains on the child's diapers and caked blood over his buttocks and between his legs and beneath his scrotum. There were small amounts of blood within the nostrils. There were both old and recent abrasions and bruises on the child's body, these being on his chest, abdomen, and right forearm. There was a recent abrasion on his upper lip, a recent bruise on the left forehead, and a fresh abrasion over the right buttock. Inside the child's chest cavity there was a large area of fresh hemorrhage beneath the surface

of the right diaphragm and in the base of the right lung. Within his abdomen there was approximately 75 to 100 milliliters of fresh blood and free lying blood clots, and a "very large V-shaped, irregular laceration of the liver on its left side, almost in the midline that virtually, but not completely, bisected the liver, that is, broke it in two." Hemorrhage extended downward from the liver into an area which showed a rupture of the urethra. There was a small amount of bloody urine in the urinary bladder.

In the opinion of the pathologist, the child's death was caused by the blood and blood clots in the peritoneal cavity, secondary to the rupture of the liver, which was in turn caused by some trauma, and death "probably occurred somewhere within five minutes after the trauma occurred." Concerning the trauma, the pathologist testified:

> This type of trauma, in my opinion, was such that it created an intense and rather sudden increase in the intra-abdominal pressure, so that the pressure on the liver and the capsule that surrounds the liver, couldn't stand this pressure, and it ruptured. I could say you could liken it to squeezing a balloon to the point where it pops.

On cross-examination, the pathologist testified that the only recent abrasions on the child's body were the one on the lip and the one on the right buttock; that the other abrasions "could have happened days or weeks or months before;" that in his opinion the trauma that resulted in rupturing the liver was inflicted to the child's abdomen; that he did not find any abrasions to the abdomen that he could say would be a causative factor of trauma; and that it was extremely unlikely that any trauma inflicted to the buttocks of the child could have caused a rupture of the child's liver.

Police Officer Bruce McSwain interviewed defendant on the day following Michael Leak's death. Officer McSwain took defendant's statment and reduced it to writing, and defendant signed the written statement. The text of the statement, which was introduced in evidence after a *voir dire* hearing was conducted to determine its competency, is as follows:

> About 10:00 P.M. on Saturday night, my wife, Vivian Marie Jones, was at the Sportsman's Club. I, Walter Lee Roy Jones, spanked Michael Leak with a comb. He had been crying. I

spanked the baby on the back. I don't know how many times I hit the baby. I was pissed off at the baby for crying. I had drunk some vodka. I started drinking about 7:30 P.M. I drunk a half pint by 9:00 P.M. I was feeling bad. I had something on my mind. I was supposed to go to Court on January the 17, 1977. I was trying to find out how I could raise the money. The baby kept crying, and he got on my nerves. I kept telling him to hush up. He kept crying. It looked like he would stop, and then start back up. I was spanking the baby on the floor. I had ahold of one of his hands and was spanking the baby on the back. He hit his mouth on the side of the bed. After I spanked the baby, I put it to bed, and it went to sleep. The shirt the baby had on had blood on it. I took the shirt off and put it in the laundry basket. I spanked the baby hard. I would say that I spanked it bad. When I first grabbed the baby, I grabbed it up by the collar. I told him I was going to spank him. I, Walter Jones, yelled at him. I slapped him. I started spanking him with the comb. Then I spanked him with my hands. I told him to hush. He didn't hush. I spanked him some more with my hands. I hit him hard. I know I hit him hard. He didn't want to stand up. I kept telling him to stand up. He was a hard-headed child. Sometimes, I would stand him up and make him stand there for thirty minutes for punishment.

The defendant did not introduce evidence. The jury found him guilty of second degree murder. From judgment on the verdict, defendant appealed.

*Attorney General Edmisten by Associate Attorney James L. Stuart for the State.*

*Coble, Morton, Grigg & Odom by Ernest H. Morton, Jr., for defendant appellant.*

PARKER, Judge.

At the close of the evidence, the court granted defendant's motion to dismiss the charge of first degree murder but denied his motion to dismiss as to all lesser included offenses. On this appeal, the sole question presented for review concerns the court's denial of defendant's motion to dismiss the charges of second degree murder and voluntary manslaughter. Defendant concedes

that the evidence was sufficient to carry the case to the jury on the charge of involuntary manslaughter, but he contends it was insufficient to support a verdict finding him guilty of second degree murder or voluntary manslaughter. We find no error.

"A motion to nonsuit in a criminal case requires consideration of the evidence in the light most favorable to the State, and the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom. . . . If there is substantial evidence — whether direct, circumstantial, or both — to support a finding that the offense charged has been committed and that defendant committed it, a case for the jury is made and nonsuit should be denied." *State v. McKinney*, 288 N.C. 113, 117, 215 S.E. 2d 578, 581-82 (1975). Viewing the evidence in the present case in the light most favorable to the State, we find it sufficient to support findings both that the offense of second degree murder was committed and that defendant committed it.

[1] There was evidence from which the jury could find that at 9:30 p.m. on 16 January 1977 Michael Leak, a twenty-month old baby boy, was alive and well. Three and a half hours later he was dead. During that entire time he and defendant were alone together in the house. His death resulted from a trauma sufficiently severe to tear his liver almost in two. At the beginning of the three and a half hour period the baby, although well, bore abrasions and bruises which furnish mute evidence that he had previously been subjected to physical abuse by someone. At the beginning of the three and a half hour period the defendant, a grown man, was engaged in forcing the baby to stand at attention for a protracted period. Defendant admitted that he later "spanked the baby on the back," that he didn't "know how many times [he] hit the baby," that he "was pissed off at the baby for crying," that the baby kept crying and he kept telling him to hush up, that he "spanked the baby hard," that he would say that he "spanked it bad," that he "started spanking him with the comb" and then spanked him with his hands, that he "hit him hard," that he knew he "hit him hard." Although defendant's statement to the officer was that after he spanked the baby, he put it to bed and it went to sleep, the State was not bound by the exculpatory portion of defendant's confession, since there was other evidence tending to throw a different light on the circumstances of the homicide. *State v. Bright*, 237 N.C. 475, 75 S.E. 2d 407 (1953). The more rea-

sonable inference which the jury could draw from all of the evidence in this case is that the baby did not go to sleep but that he died and that his death resulted immediately and proximately from the hard blows inflicted on him by the defendant. That the pathologist was unable to identify any particular recent bruise or abrasion on the outside of the child's body as having been caused by the particular blow which ruptured his liver and resulted in his death does not require an inference that defendant never delivered such a blow. The more reasonable inference from all of the evidence is that he did.

[2] "A specific intent *to kill*, while a necessary constituent of the elements of premeditation and deliberation in first degree murder, is not an element of second degree murder or manslaughter." *State v. Gordon*, 241 N.C. 356, 358, 85 S.E. 2d 322, 324 (1955). "Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation." *State v. Foust*, 258 N.C. 453, 458, 128 S.E. 2d 889, 892 (1963). The malice required for second degree murder may be implied from evidence that the victim's death resulted from an attack by hands alone, without use of other weapon, when, as here, the attack was made by a mature man upon a defenseless infant. *State v. Sallie*, 13 N.C. App. 499, 186 S.E. 2d 667 (1972). We find the evidence in the present case sufficient to sustain the jury's verdict finding defendant guilty of second degree murder.

No error.

Chief Judge BROCK and Judge ARNOLD concur.