644 S.E.2d 580 (2007)
In the Matter of J.S.B., D.K.B., D.D.J., Z.A.T.J., Minor Children.
No. COA06-1107.
Court of Appeals of North Carolina.
May 15, 2007.
Mecklenburg County Attorney's Office, by J. Edward Yeager, Jr., for petitioner-appellee.
Wyrick Robbins Yates & Ponton LLP, by K. Edward Greene and Adrienne E. Allison, Raleigh, for respondent-appellant.
Office of the Guardian ad Litem, by Jeannie Brown, Pili Fleming, Charlotte, for guardian ad litem-appellee.
Twyla George, Charlotte, for petitioner DDS.
GEER, Judge.
Respondent mother appeals from an order of the district court terminating her parental rights as to her children J.S.B., D.K.B., D.D.J., and Z.A.T.J. (a girl and three boys). Although respondent argues that several key findings of fact made by the trial court rely on inadmissible hearsay evidence, we hold that the evidence was properly admitted under well-established hearsay exceptions. We further conclude that the trial court's findings fully support its determination that respondent committed voluntary manslaughter of her 14-month-old child  an act that constitutes grounds for termination of parental rights as to respondent's other children under N.C. Gen.Stat. § 7B-1111(a)(8) (2005). Because respondent has also failed to demonstrate *582 that the trial court abused its discretion in concluding that termination of respondent's parental rights would be in the children's best interests, we affirm the order of the trial court.

Facts
Petitioner Mecklenburg County Department of Social Services, Youth and Family Services Division ("YFS"), became involved with respondent's family in 1996. YFS received at least two reports that respondent had physically abused or inappropriately disciplined her children. YFS' records from 1998 through 2000 reflected reports of scratches, scarring, and stripes on the children; that respondent and her boyfriend had sex in front of the children; of respondent's failure to obtain prenatal care during one of her pregnancies; of J.S.B., at the age of 4 or 5, having issues of sexualized behavior and wetting herself; and of J.S.B.'s being underweight.
On 3 October 2003, one of respondent's children, X.L.J., who was 14 months old at the time, died. On the night of his death, at about 11:00 p.m., respondent noticed that the child was not breathing. Rather than call 911, respondent placed a cold cloth on X.L.J., and respondent's boyfriend later attempted CPR. The child never revived. Just two days prior to X.L.J.'s death, respondent had rejected outreach services from YFS.
The following day, the medical examiner's office conducted an examination of X.L.J.'s body and noted acute chronic injuries to his head, cheek, and nose. There were also abrasions over one eye and a bruise on the right side of the head. The medical examiner determined that the cause of death was an abusive head injury that could not have been self-inflicted.
Respondent was interviewed by the police on 3 and 4 October 2003 and admitted to hitting X.L.J. in the head with a belt at around 9:30 p.m., after which she placed him in his crib. J.S.B. told police that she saw her mother whip X.L.J. and hit him on the head. On 4 October 2003, respondent was arrested and charged with the murder of X.L.J. She has remained incarcerated since that time.
On the day of respondent's arrest, YFS obtained custody over the remaining children (J.S.B., D.K.B., and D.D.J.). By an order dated 5 December 2003, the district court adjudicated the three siblings as neglected and dependent juveniles. Several months after her arrest, while in jail and awaiting trial, respondent gave birth to another child, Z.A.T.J. YFS also assumed custody of Z.A.T.J., and the district court adjudicated Z.A.T.J. a neglected and dependent juvenile in an order dated 18 March 2004.
When J.S.B. was first placed in custody with YFS, she had lesions and marks on her body, her glasses were broken, her shoes were too small, she had a foot deformity, she was very introverted and would not make eye contact, and she was a bed wetter. Similarly, one of the boys also was a bed wetter, had marks and bruises on his body, was introverted and refused to make eye contact, wore too-small shoes, and had difficulties focusing on any discussion. Another son did not communicate openly when he first went into foster care.
On 2 November 2004, YFS filed petitions to terminate respondent's parental rights, as well as the parental rights of the children's biological fathers. Following several hearing dates, the trial court entered an order on 3 March 2006 terminating the parental rights of respondent mother and the two fathers.[1] With respect to respondent mother, the order found that the following grounds existed for terminating her parental rights: N.C. Gen.Stat. § 7B-1111(a)(1) (neglect); N.C. Gen.Stat. § 7B-1111(a)(6) (inability to provide proper care and supervision, such that her children are "dependent"); and N.C. Gen.Stat. § 7B-1111(a)(8) (respondent's commission of voluntary manslaughter of one of her own children). The court further concluded that termination of parental rights was in the juveniles' best interests. Respondent mother gave timely notice of appeal to this Court.

*583 I
Respondent argues that the following two findings in the trial court's order are based on improperly admitted hearsay testimony:
14. X.L.J. died when he was only fourteen (14) months old. He dies [sic] from an abusive head injury which he could not have inflicted on himself.
. . . .
16. The medical examiner's office examined [X.L.J.]'s body on October 4, 2003. The examination of the body showed acute chronic injuries to the head, cheek, and nose. There was also a bruise on the right side of the head and abrasions over one of the eyes.
The record shows that the content of these two findings is based on an investigation report and an autopsy report generated by the Mecklenburg County Medical Examiner's Office following the death of X.L.J.
At trial, the county medical examiner, Dr. James Sullivan, used the reports to testify as to the injuries observed on X.L.J.'s body and as to the cause of death. Although Dr. Sullivan did not personally examine X.L.J.'s body and did not author the reports, he testified that he had reviewed the reports, which were prepared by a fellow pathologist who had since moved out of state.
Upon respondent's objection to the admission of the reports, YFS argued that the reports fit the "business records" exception to the hearsay rule. See N.C.R. Evid. 803(6). After observing that the North Carolina appellate courts "have upheld decisions to admit these reports," the trial court ruled the medical examiner's investigation report and the autopsy report were admissible.
We do not address respondent's arguments regarding the "business records" exception because we believe the reports were properly admitted pursuant to the "public records" exception, N.C.R. Evid. 803(8). Under the "public records" exception, the following hearsay is admissible:
Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law-enforcement personnel, or (C) in civil actions and proceedings and against the State in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.
N.C.R. Evid. 803(8).
In this case, the medical examiner's reports met the criteria of Rule 803(8)(B) and (C). Dr. Sullivan's office was acting under its statutory duty to investigate and report its factual findings related to X.L.J.'s death. See N.C. Gen.Stat. § 130A-385(a) (2005) (when medical examiner's office obtains jurisdiction over a body, the office "shall take charge of the body, make inquiries regarding the cause and manner of death, reduce the findings to writing and promptly make a full report to the Chief Medical Examiner"). These reports are precisely the types of records intended to be admitted under Rule 803(8).
Indeed, other jurisdictions have admitted such reports under the public records exception to the hearsay rule. See, e.g., United States v. Rosa, 11 F.3d 315, 333 (2d Cir.1993) (New York City medical examiner's written autopsy report is admissible as public record under Fed.R.Evid. 803(8)), cert. denied, 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994); State v. Davis, 141 S.W.3d 600, 630 (Tenn.2004) ("The autopsy reports are admissible hearsay under Rules 803(6) and 803(8) of the Tennessee Rules of Evidence."), cert. denied, 543 U.S. 1156, 125 S.Ct. 1306, 161 L.Ed.2d 123 (2005); Tex. Workers' Comp. Comm'n v. Wausau Underwriters Ins., 127 S.W.3d 50, 62 (Tex.App.2003) ("An autopsy report is admissible under the public-records hearsay exception of the Texas Rules of Evidence."), review denied, 04-0064, 2004 Tex. LEXIS 547 (2004); State v. Correia, 600 A.2d 279, 285 (R.I.1991) (holding that autopsy report prepared by medical examiner was admissible under Rule 803(8)).
*584 The fact that the report contains a medical examiner's opinion as to X.L.J.'s cause of death, in addition to objective observations of the child's physical injuries, does not detract from the report's admissibility. See Segrest v. Gillette, 331 N.C. 97, 103, 414 S.E.2d 334, 337 (1992) (recognizing that, under Rules of Evidence 803(8) and 803(9), "opinions contained on death certificates are no longer barred by the hearsay rule"); N.C.R. Evid. 803(8) official commentary ("The term `factual findings' [in part C] is not intended to preclude the introduction of evaluative reports containing conclusions or opinions."). Nor is the report's admissibility affected simply because it was admitted during the testimony of Dr. Sullivan, who did not personally participate in the examination of X.L.J.'s body. See State v. Forte, 360 N.C. 427, 434-36, 629 S.E.2d 137, 142-44 (SBI laboratory reports admissible under both "business records" and "public records" exceptions even though reports were admitted through SBI agent who did not conduct underlying analysis but oversaw non-testifying agent who did), cert. denied, ___ U.S. ___, 127 S.Ct. 557, 166 L.Ed.2d 413 (2006). Accordingly, the trial court did not err in admitting the medical examiner's investigation and autopsy reports or in basing its findings of fact on those reports.

II
Respondent next argues that the trial court improperly allowed a police detective to testify, over respondent's objection, regarding J.S.B.'s statements that she saw her mother whip X.L.J. and hit him on the top of his head. The court admitted this testimony pursuant to the "excited utterance" exception to the hearsay rule. See N.C.R. Evid. 803(2) (defining excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). The court then relied upon this testimony in making the following finding of fact:
[J.S.B.] witnessed the death of [X.L.J.]. On October 4, 2003, [J.S.B.] was interviewed by Detective Susan Sarvis of the Charlotte-Mecklenburg Police Department. The interview occurred at the Law Enforcement Center in Charlotte, North Carolina. [J.S.B.] told Charlotte-Mecklenburg police investigating officer, Detective Sarvis, that [respondent] whipped [X.L.J.] and that [respondent] hit [X.L.J.] on top of his head. [J.S.B.] also indicated that [respondent] was angry with her for seeing [respondent] whip [X.L.J.].
"In order to fall within this hearsay exception, there must be (1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication." State v. Smith, 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985). "When considering the spontaneity of statements made by young children, there is more flexibility concerning the length of time between the startling event and the making of the statements because `the stress and spontaneity upon which the exception is based is often present for longer periods of time in young children than in adults.'" State v. Boczkowski, 130 N.C.App. 702, 710, 504 S.E.2d 796, 801 (1998) (quoting Smith, 315 N.C. at 87, 337 S.E.2d at 841).
Here, J.S.B., who was nine years old, made her statements to the detective 16 hours after witnessing conduct that led to her brother X.L.J.'s death. During the 16 hours after J.S.B. saw her mother hit her brother on the head, her mother's boyfriend had attempted CPR on the child, emergency medical technicians had arrived and taken X.L.J. to the hospital, and X.L.J. had died. J.S.B. also acknowledged that her mother was angry that J.S.B. had seen her hit X.L.J. Further, when J.S.B. was interviewed she would become "teary-eyed" and very withdrawn while talking about X.L.J. She was also found in the Victim Assistance room "basically in a corner in like a ball, like a fetal position."
We hold that under these circumstances  especially given prior cases involving statements by young children  J.S.B.'s statements were properly admitted as an excited utterance. See, e.g., State v. Burgess, ___ N.C.App. ___, ___, 639 S.E.2d 68, 75 (2007) ("In the present case, fewer than twenty-four hours had elapsed between the time S.P. *585 yelled at [the child], the sexual assault, and [the child's] statements to her mother."); Boczkowski, 130 N.C.App. at 709-10, 504 S.E.2d at 801 (holding excited utterance exception applied when nine-year-old's mother died in early morning hours and she made statements to neighbor approximately seven to eight hours later that day); State v. Rogers, 109 N.C.App. 491, 501, 428 S.E.2d 220, 226 ("Thus, statements made by young children three days after an alleged sexual assault, which relate to the assault, have been deemed admissible under the excited utterance exception."), cert. denied, 334 N.C. 625, 435 S.E.2d 348 (1993), cert. denied, 511 U.S. 1008, 114 S.Ct. 1378, 128 L.Ed.2d 54 (1994).
Respondent argues that these cases are inapposite because J.S.B. "was not the direct victim of the action about which she made statements," and she "made the statements in response to a police officer's questions." We find these arguments unpersuasive. Given J.S.B.'s conduct and demeanor when making the disputed statements, it is apparent that witnessing her mother striking her baby brother on the head  which injury resulted in his death  was a sufficiently traumatic experience to cause J.S.B. to continue to experience its effects 16 hours later, allowing her statements at that time to qualify as excited utterances. See State v. Lowe, 154 N.C.App. 607, 613, 572 S.E.2d 850, 855 (2002) ("[W]itnessing one's father cause serious physical injury to one's mother, friends and oneself is certainly a sufficiently traumatic experience for a child[ ] to support this same latitude being given to the time span between the incident and the utterance."). Further, "our case law is clear that statements made in response to a posed question do not necessarily lack spontaneity." Id. at 612, 572 S.E.2d at 855. Accordingly, we hold that the trial court did not err in admitting J.S.B.'s statements to the detective.

III
We next address respondent's contention that the trial court erred in concluding that grounds existed under N.C. Gen.Stat. § 7B-1111 for termination of respondent's parental rights. Because we hold that the trial court properly found a sufficient basis for termination of parental rights under N.C. Gen. Stat. § 7B-1111(a)(8), we need not address respondent's arguments as to the other grounds. In re B.S.D.S., 163 N.C.App. 540, 546, 594 S.E.2d 89, 93-94 (2004) ("Having concluded that at least one ground for termination of parental rights existed, we need not address the additional ground[s] . . . found by the trial court.").
A termination of parental rights proceeding is conducted in two phases: (1) an adjudication phase that is governed by N.C. Gen.Stat. § 7B-1109 (2005) and (2) a disposition phase that is governed by N.C. Gen.Stat. § 7B-1110 (2005). In re Blackburn, 142 N.C.App. 607, 610, 543 S.E.2d 906, 908 (2001). During the adjudication stage, petitioner has the burden of proving by clear, cogent, and convincing evidence that one or more of the statutory grounds for termination set forth in N.C. Gen.Stat. § 7B-1111 exist. The standard of appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether the findings of fact support the conclusions of law. In re Huff, 140 N.C.App. 288, 291, 536 S.E.2d 838, 840 (2000), appeal dismissed and disc. review denied, 353 N.C. 374, 547 S.E.2d 9 (2001).
Under N.C. Gen.Stat. § 7B-1111(a)(8), the trial court may terminate parental rights upon finding that "[t]he parent has committed murder or voluntary manslaughter of another child of the parent or other child residing in the home. . . ." The statute further provides two ways in which a petitioner may establish this ground for termination:
The petitioner has the burden of proving any of these offenses in the termination of parental rights hearing by (i) proving the elements of the offense or (ii) offering proof that a court of competent jurisdiction has convicted the parent of the offense, whether or not the conviction was by way of a jury verdict or any kind of plea.
Id.
In this case, because respondent had not yet been tried on the first degree murder charges, YFS sought to establish this ground for termination by "proving the elements" of voluntary manslaughter. Respondent contends *586 that the trial court applied the wrong standard of proof and that petitioner was required to prove these elements beyond a reasonable doubt rather than under the customary "clear and convincing evidence" standard.
Respondent cites no authority that supports this contention, but rather simply asserts that "[t]o allow proof of a crime by the lower `clear and convincing' standard is unjust." The Juvenile Code, however, unambiguously states that "[t]he burden in [termination of parental rights] proceedings shall be upon the petitioner or movant to prove the facts justifying such termination by clear and convincing evidence." N.C. Gen.Stat. § 7B-1111(b) (emphasis added).
As has been explained by our Supreme Court  in a quotation cited frequently by this Court  this "standard is greater than the preponderance of the evidence standard required in most civil cases, but not as stringent as the requirement of proof beyond a reasonable doubt required in criminal cases." In re Montgomery, 311 N.C. 101, 109-10, 316 S.E.2d 246, 252 (1984). This Court, in turn, has explained the reason for the differing standards of proof:
"The burden of proof required to terminate a parent's rights, although greater than that required for an ordinary civil proceeding, is still less than that required to convict a person of a crime. The requirement that a person accused of a crime be found guilty beyond a reasonable doubt is based on the common law presumption of innocence. The statutory burden of proof for a severance proceeding, on the other hand, is required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Thus, the burdens of proof are neither `very similar' nor do they derive from the same source."
In re Harrison, 136 N.C.App. 831, 833, 526 S.E.2d 502, 503 (2000) (quoting Denise H. v. Ariz. Dep't of Econ. Sec., 193 Ariz. 257, 259, 972 P.2d 241, 243 (1998)).
Our legislature has chosen to employ a "clear and convincing evidence" standard in termination of parental rights proceedings. In order to override this legislative decision, respondent would need to point to some constitutional entitlement to the more rigorous criminal standard of proof. She has failed to do so, and we know of none. In the absence of a constitutional mandate, the question whether it is "just" to use the "clear and convincing evidence" standard when the grounds for termination have criminal corollaries raises a question of policy better directed to the General Assembly.
We observe further that this civil determination  made by a judge and not a jury  is not admissible in any subsequent criminal proceeding. Our Supreme Court has stated:
It is generally held that a judgment in a civil action is not admissible in a subsequent criminal prosecution although exactly the same questions are in dispute in both cases, for the reason that the parties are not the same, . . . different rules as to the weight of the evidence prevail[, and] it would not be just to convict a defendant in a criminal action by reason of a judgment obtained against him in a civil action [with a lower standard of proof].
State v. Dula, 204 N.C. 535, 536, 168 S.E. 836, 836-37 (1933) (internal quotation marks and citation omitted); see also N.C. Gen.Stat. § 1-149 (2005) ("No [civil] pleading can be used in a criminal prosecution against the party as proof of a fact admitted or alleged in it.").
We note in passing that respondent's position would compel application of the "beyond a reasonable doubt" standard in many termination cases, since frequently the conduct at issue would also constitute a crime. See, e.g., N.C. Gen.Stat. § 14-27.2 (2005) (statutory rape); N.C. Gen.Stat. § 14-27.4 (2005) (statutory sexual offense); N.C. Gen.Stat. § 14-178 (2005) (incest); N.C. Gen.Stat. § 14-202.1 (2005) (indecent liberties with children); N.C. Gen.Stat. § 14-316.1 (2005) (contributing to delinquency and neglect of juvenile); N.C. Gen.Stat. § 14-318.2 (2005) (child abuse as a misdemeanor); N.C. Gen.Stat. § 14-318.4 (2005) (child abuse as a felony); N.C. Gen.Stat. § 14-322 (2005) (abandonment and failure to support spouse and children). Further, criminal ramifications might exist in other cases, such as those involving abuse of controlled substances. The question could *587 arise in those cases whether the possible involvement of illegal conduct  even when the child is not a victim in the criminal sense  would require the higher standard of proof.
We cannot find any authority  and respondent points to none  that would justify the application of differing standards of proof depending on whether the alleged ground for termination could also constitute a criminal offense. Respondent has failed to show any basis for disregarding the specific standard set forth by the General Assembly and, therefore, we hold that the trial court applied the proper standard of proof.
Respondent next argues that the trial court made inadequate findings of fact with respect to N.C. Gen.Stat. § 7B-1111(a)(8). In its termination order, the trial court made both a finding of fact and a conclusion of law that respondent committed voluntary manslaughter of X.L.J.:
[Finding of Fact] 26. [Respondent] was arrested and charged with the murder of X.L.J. on October 4, 2003. She has remained incarcerated since that time. [Respondent] committed voluntary manslaughter of [X.L.J.], without malice.
. . . .
[Conclusion of Law] 16. [Respondent] has committed voluntary manslaughter, without malice of [X.L.J.], a child of [respondent].
Respondent contends that the trial court should have made individual findings of fact with respect to each element of the crime of voluntary manslaughter.
Those elements were set forth in State v. Best, 59 N.C.App. 96, 97, 295 S.E.2d 774, 775 (1982): "(1) [the] unlawful killing of a human being, (2) without malice, and (3) without premeditation and deliberation." Assuming, without deciding, that the trial court was required to make specific findings as to each element of the crime of voluntary manslaughter, we hold that the trial court has adequately done so.
In addition to the above finding of fact establishing that respondent acted "without malice," the court made the following pertinent findings of fact:
12. The mother had another child, X.L.J. [X.L.J.]'s crib was located in the mother's room. On October 03, 2003, around 11:00 p.m., [respondent] noticed that X.L.J. was not breathing.
13. [Respondent] did not call 911 when she discovered [X.L.J.] was not breathing. Instead, she got a cold cloth and placed it on the child. Afterwards, she went to get Antoine Welch, her boyfriend. Antoine Welch attempted to perform CPR on [X.L.J.].
14. X.L.J. died when he was only fourteen (14) months old. He dies [sic] from an abusive head injury which he could not have inflicted on himself.
. . . .
16. The medical examiner's office examined [X.L.J.]'s body on October 4, 2003. The examination of the body showed acute chronic injuries to the head, cheek, and nose. There was also a bruise on the right side of the head and abrasions over one of the eyes.
. . . .
20. [Respondent] confessed to taking off her belt and hitting [X.L.J.] in the head with the belt. [Respondent] stated to the police that she hit [X.L.J.] about 9:30 p.m. She stated that after she hit the child, she laid the child in the crib. [Respondent] contradicted herself in her statements to the police. Earlier she stated that she hit [X.L.J.] while she was putting her belt on.
. . . .
23. [J.S.B.] witnessed the death of [X.L.J.] . . . [J.S.B.] told Charlotte-Mecklenburg police investigating officer, Detective Sarvis, that the mother whipped [X.L.J.] and that the mother hit [X.L.J.] on top of his head. . . .
24. [One of the other children] confirmed that the mother used a switch on the children.
. . . .

*588 46. The respondent mother used a belt or whip on the children as a discipline technique.
47. [Respondent] holds the belief that physical discipline is required to keep children from "running over you."
Taken together, these findings amply support the ultimate finding of fact that respondent committed voluntary manslaughter. See State v. Jones, 35 N.C.App. 48, 52-53, 239 S.E.2d 874, 877-78 (1978) (where evidence showed that baby died following trauma to his liver and defendant admitted to hitting baby, such evidence was sufficient to survive motion to dismiss charges of second degree murder and voluntary manslaughter).
The trial court adequately explained its basis for finding that respondent had committed voluntary manslaughter. We therefore hold the trial court made sufficient findings of fact to support its conclusion that grounds existed to terminate respondent's parental rights under N.C. Gen.Stat. § 7B-1111(a)(8).[2]

IV
Lastly, we address respondent's contention that the trial court erroneously concluded that termination of her parental rights would be in the best interests of the juveniles. If petitioner meets its burden of proving that grounds for termination exist, the trial court moves to the disposition phase and must consider whether termination is in the best interests of the child. N.C. Gen. Stat. § 7B-1110(a). The trial court's decision to terminate parental rights is reviewed under an abuse of discretion standard. In re Nesbitt, 147 N.C.App. 349, 352, 555 S.E.2d 659, 662 (2001).
Relying on N.C. Gen.Stat. § 7B-1110, respondent asserts that the trial court failed to make findings consistent with the six factors listed at § 7B-1110(a)(1)-(6). These factors were added by an amendment of the statute in 2005 and apply only to petitions filed on or after 1 October 2005. 2005 N.C. Sess. Laws ch. 398, §§ 17, 19. The petitions in this case were filed 2 November 2004, and, accordingly, the amendments do not apply.
The applicable version of the statute, N.C. Gen.Stat. § 7B-1110(a) (2003), states that once the trial court finds at least one ground for termination of parental rights, "the court shall issue an order terminating the parental rights of such parent with respect to the juvenile unless the court shall further determine that the best interests of the juvenile require that the parental rights of the parent not be terminated." Apart, however, from her misplaced argument regarding the 2005 version of the statute, respondent makes no argument as to why the trial court's "best interests" determination constitutes an abuse of discretion.
Nevertheless, based upon our review of the trial court's findings regarding respondent's prior treatment of her children, her responsibility for X.L.J.'s death, the children's condition when entering foster care, and their current condition, we perceive no abuse of discretion in the decision to terminate her parental rights. Accordingly, we affirm.
Affirmed.
Judges TYSON and ELMORE concur.
NOTES
[1] Neither of the respondent fathers is a party to this appeal.
[2] Respondent also contends that the trial court's finding that she "contradicted herself" during questioning by the police was not supported by the evidence. The record, however, indicates that respondent presented different scenarios to describe how her belt came to strike the baby's head. These different scenarios are sufficient to support the trial court's finding that she contradicted herself.